

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

**NO. 2-09-335-CV**

IN RE CHASSIDIE L. RUSSELL                                                    RELATOR

------------

ORIGINAL PROCEEDING

------------

## OPINION

------------

This is an original proceeding in which Relator Chassidie L. Russell contends that the trial court abused its discretion by entering temporary orders on August 3, 2006, October 19, 2006, and February 15, 2007, and by entering its June 3, 2009 order determining that Janet Harvey and Kenneth Harvey ("the Harveys") had standing to intervene in the underlying proceeding regarding the modification of custody. Chassidie asks this court to order the trial court to vacate its temporary orders; order the Harveys to return her daughter, CAIH, and her daughter's personal belongings to her; order the trial court to dismiss the Harveys' pleadings for lack of standing; and order the Harveys to pay all costs of court and the reasonable and necessary attorney's fees incurred by her. We conditionally grant the writ.

## Background

Chassidie married David Harvey in February 2000. On March 15, 2000, Chassidie gave birth to CAIH. CAIH's biological father is "Trey," an individual with whom Chassidie was involved prior to her marriage to David. Chassidie and David divorced on September 19, 2002. Under the terms of the divorce decree, Chassidie and David were named joint managing conservators of CAIH. David was granted standard visitation, and Chassidie was designated the managing conservator with the right to designate CAIH's primary residence. Between September 2002 and July 2005, David did not exercise his standard visitation. Instead, he would call Chassidie when he wanted to see CAIH and they would make informal arrangements for visitation. David, who is an active member of the military, moved to California in July 2005. Thereafter, disputes arose between Chassidie, David, and the Harveys, David's parents.

On June 15, 2006, David filed a suit to modify the parent-child relationship in which he requested telephone access to then six-year-old CAIH; that provisions be made for surrendering CAIH at an airport or to a designated competent adult due to his military service; and that provisions be made for the surrender of CAIH to the Harveys for visitation in accordance with section 153.3161 of the Texas Family Code. *See* Act of May 29, 2005, 79th Leg., R.S., ch. 916, § 13, 2005 Tex. Gen. Laws 3148, 3152. On July 19, 2006, the associate judge of the 231st District Court held a hearing on David's suit to modify. Despite the fact that the Harveys were not parties to the modification proceeding, the

2

associate judge issued a report on July 19, 2006 ordering counseling for Chassidie, the Harveys, and CAIH and granting the Harveys possession of CAIH on the first and third weekends of each month unless the counselor determined that such possession was not in CAIH's best interest. The associate judge's report was reduced to an order dated August 3, 2006. That order additionally states that "[t]he Court finds that limited possession of the child by a designated person during any deployment of David Harvey outside the State of Texas is in the best interest of the child" and thus designates the Harveys "as persons who may exercise limited possession of [CAIH] during any period that David is deployed outside the State of Texas." The report and order further stipulated that, upon the conclusion of David's "deployment," the Harveys' rights to limited possession would terminate and the parties would be bound by the provisions of the order applicable when a parent is not deployed. The trial court rendered an additional temporary order on October 19, 2006 granting the Harveys possession of and access to CAIH on the first, third, and fifth weekends of each month and ordering counseling to continue.

Chassidie began the court-ordered therapy in July 2006 and was subsequently accused by the counselor, Cathy McGinnis, of committing "grandparent alienation."[1] The counselor recommended that the Harveys be

---

[1] ... During an October 2007 hearing, McGinnis admitted that, although she believed Chassidie was alienating the Harveys, she knows of no literature on grandparent alienation, only parent alienation.

3

given possession of CAIH because of Chassidie's behavior in alienating the Harveys from CAIH.[2]

On December 21, 2006, the Harveys filed a Motion for Enforcement of Possession or Access and Order to Appear contending that Chassidie had violated the October 19, 2006 temporary order by failing to release CAIH to them at school.[3]  The Harveys filed an Amended Motion for Enforcement of Possession or Access on January 10, 2007, in which the only relief they requested was enforcement of the trial court's October 19, 2006 temporary order granting them access to CAIH.  On January 26, 2007, the Harveys filed their first petition to modify the parent-child relationship in which they asked to be named joint managing conservators and asked for Chassidie to receive only supervised visitation with CAIH.[4]  After a hearing on January 30, 2007, the associate judge ruled that CAIH's "current living environment in the primary care of the mother, Chassidie L[.] Russell significantly impairs the child's emotional development."[5]  Accordingly, the judge named the Harveys primary joint managing conservators

_____

[2]... In their response in this court, David and the Harveys acknowledge that "[n]either David, [the Harveys] [n]or their attorneys proposed [grandparent alienation] as a ground for relief."

[3]... The Harveys' petition describes a physical and verbal altercation between them and Chassidie's *grandparents* over the transfer of possession.

[4]... Although the pleading is entitled "Supplemental Petition to Modify the Parent-Child Relationship," the Harveys had not filed or been parties to any prior petition to modify, including the petition to modify filed by David on June 15, 2006.

[5]... The associate judge's rulings were reduced to an order, which was signed on February 15, 2007.

4

of CAIH, ordered that Chassidie surrender CAIH to them immediately, and ordered that Chassidie be granted only supervised visitation with CAIH "in accordance with the recommendations of . . . McGinnis."[6]

Chassidie appealed from the associate judge's ruling on February 1, 2007, challenging, among other things, the trial court's finding that the Harveys had standing because CAIH's current living situation with her significantly impaired CAIH's emotional development. On May 9, 2007, Chassidie also filed a motion to modify the temporary orders in which she again challenged the Harveys' standing. On May 25, 2007, the associate judge signed a report finding that Chassidie had agreed to the August 3, 2006 temporary orders along with the "limited possession during military deployment" giving the grandparents access to CAIH. She also found that the Harveys had standing to proceed in the suit under section 102.004(a)(1) of the family code. Chassidie's counsel had filed a handwritten petition for "Habeas Corpus Return Child Motion to Strike [and] Set Aside," which the associate judge also denied in her May 25, 2007 report.

On June 13, 2007, the Harveys filed their first amended petition in intervention in a suit to modify the parent-child relationship in which they asked to be named joint managing conservators of CAIH and asked that Chassidie be denied access to CAIH or that she be granted only supervised access to CAIH

---

[6] ... At the hearing on January 30, 2007, the associate judge ordered Chassidie to remain in the courtroom while the Harveys took possession of CAIH at Chassidie's residence. Chassidie was not able to say goodbye to CAIH and did not see her for the next five weeks.

until further order of the court. On August 22, 2007, David filed his first amended petition to modify the parent-child relationship in which he again requested telephone access to CAIH; that provisions be made for surrendering CAIH at an airport or to a designated competent adult due to his military service; and that provisions be made for the surrender of CAIH to the Harveys for visitation in accordance with section 153.3161 of the Texas Family Code.

The case was set for final trial in October 2007. However, Chassidie filed an appeal of the associate judge's rulings, and the court reset the final trial and heard only the appeal of the associate judge's reports and temporary orders. On June 3, 2009, the trial court issued an order finding that the Harveys had standing to intervene in the underlying proceeding. On September 28, 2009, Chassidie filed this original proceeding complaining of the trial court's August 3, 2006, October 19, 2006, February 15, 2007, and June 3, 2009 orders.

## Standard of Review

Mandamus relief is proper only to correct a clear abuse of discretion when there is no adequate remedy by appeal. *In re Columbia Med. Ctr. of Las Colinas*, 290 S.W.3d 204, 207 (Tex. 2009) (orig. proceeding).

A trial court clearly abuses its discretion when it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex. 1992) (orig. proceeding). With respect to the resolution of factual issues or matters committed to the trial court's discretion, we may not substitute our judgment for that of the trial court unless the

relator establishes that the trial court could reasonably have reached only one decision and that the trial court's decision is arbitrary and unreasonable. *Id.* at 839–40. This burden is a heavy one. *In re CSX Corp.*, 124 S.W.3d 149, 152 (Tex. 2003) (orig. proceeding). We give deference to a trial court's factual determinations, but we review the trial court's legal determinations de novo. *In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 643 (Tex. 2009) (orig. proceeding). A trial court abuses its discretion if it incorrectly interprets or improperly applies the law. *In re Dep't of Family & Protective Services.*, 273 S.W.3d 637, 642B43 (Tex. 2009) (orig. proceeding); *Walker*, 827 S.W.2d at 840.

Absent extraordinary circumstances, mandamus will not issue unless relator lacks an adequate remedy by appeal. *In re Van Waters & Rogers, Inc.*,145 S.W.3d 203, 210–11 (Tex. 2004) (orig. proceeding) (citing *Walker*, 827 S.W.2d at 839). Whether a clear abuse of discretion can be adequately remedied by appeal depends on a careful analysis of costs and benefits of interlocutory review. *In re McAllen Med. Ctr., Inc.*, 275 S.W.3d 458, 464 (Tex. 2008) (orig. proceeding). As this balance depends heavily on circumstances, it must be guided by analysis of principles rather than simple rules that treat cases as categories. *Id.* An appellate remedy is adequate when any benefits to mandamus review are outweighed by the detriments. *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 136 (Tex. 2004) (orig. proceeding). When the benefits outweigh the detriments, we must conduct further analysis. *Id.* An appeal is inadequate for mandamus purposes when parties are in danger of permanently

7

losing substantial rights, such as when the appellate court would not be able to cure the error; the party's ability to present a viable claim or defense is vitiated; or the error cannot be made part of the appellate record. *Van Waters & Rogers, Inc.*, 145 S.W.3d at 210–11; *Walker*, 827 S.W.2d at 843–44. An appellate court should also consider whether mandamus will allow the court to give needed and helpful direction to the law that would otherwise prove elusive in appeals from final judgments and whether mandamus will spare litigants and the public the time and money utterly wasted enduring eventual reversal of improperly conducted proceedings. *In re Team Rocket, L.P.*, 256 S.W.3d 257, 262 (Tex. 2008) (orig. proceeding).

Because a trial court's temporary orders are not appealable, mandamus is an appropriate means to challenge them. *See, e.g., In re Derzapf*, 219 S.W.3d 327, 334–35 (Tex. 2007) (orig. proceeding) (granting mandamus relief and directing trial court to vacate its temporary orders granting grandparents access to grandchild); *Little v. Daggett*, 858 S.W.2d 368, 369 (Tex. 1993) (orig. proceeding) (holding that mandamus is appropriate remedy because temporary order granting visitation is not appealable); *Dancy v. Daggett*, 815 S.W.2d 548, 549 (Tex. 1991) (orig. proceeding) (holding that mandamus is an appropriate remedy because "the trial court's issuance of temporary orders is not subject to interlocutory appeal"); *In re J.W.L.*, 291 S.W.3d 79, 83 (Tex. App.—Fort Worth 2009, orig. proceeding) (holding that mandamus is appropriate to challenge temporary orders because they are not subject to interlocutory appeal); *In re*

8

*Garza*, 153 S.W.3d 97, 100 (Tex. App.—San Antonio 2004, orig. proceeding) (holding that mandamus is appropriate to challenge temporary orders).

**The Trial Court Abused its Discretion by Granting the Harveys Possession of CAIH in the August 3, 2006 and October 19, 2006 Temporary Orders**

**A. Texas Family Code Section 153.3161**

Chassidie contends that the trial court abused its discretion by awarding the Harveys access and visitation based on the 2005 version of section 153.3161 of the family code because there was no evidence that David had been or was deployed. *See* Act of May 29, 2005, 79th Leg., R.S., ch. 916, § 13, 2005 Tex Gen. Laws 3148, 3152. David's pleadings—the only pleadings on file when the temporary orders were rendered—asked that his parents be able to exercise his possession under section 153.3161 of the family code. That section provided,

Sec. 153.3161. LIMITED POSSESSION DURING MILITARY DEPLOYMENT. (a) In addition to the general terms and conditions of possession required by section 153.316, if a possessory conservator or a joint managing conservator of the child without the exclusive right to designate the primary residence of the child is currently a member of the armed forces of the state or the United States or is reasonably expected to join those forces, the court shall:

(1) permit that conservator to designate a person who may exercise limited possession of the child during any period that the conservator is *deployed outside* of the United States; and

(2) if the conservator elects to designate a person under Subdivision (1), provide in the order for limited possession of the child by the designated person under those circumstances, subject to the court's determination that the limited possession is in the best interest of the child.

9

(b)    If the court determines that the limited possession is in the best interest of the child, the court shall provide in the order that during periods of deployment:

(1)    the designated person has the right to possession of the child on the first weekend of each month beginning at 6 p.m. on Friday and ending at 6 p.m. on Sunday;

(2)    the other parent shall surrender the child to the designated person at the beginning of each period of possession at the other parent's residence;

(3)    the designated person shall return the child to the other parent's residence at the end of each period of possession;

(4)    the child's other parent and the designated person are subject to the requirements of Sections 153.316(5)–(9);

(5)    the designated person has the rights and duties of a nonparent possessory conservator under Section 153.376(a) during the period that the person has possession of the child; and

(6)    the designated person is subject to any provision in a court order restricting or prohibiting access to the child by any specified individual.

(c)    After the deployment is concluded, and the deployed parent returns to that parent's usual residence, the designated person's right to limited possession under this section terminates and the rights of all affected parties are governed by the terms of any court order applicable when a parent is not deployed.

*See id.* (emphasis added).  Thus, the only pleading on file that could support the trial court's decision to grant the Harveys possession and access in July and October 2006 is under this section.

The 2005 version of section 153.3161, which has since been repealed, conferred authority upon the trial court to allow a parent to designate an individual to exercise the parent's visitation during any periods in which the parent was

10

deployed outside the United States. *See id.* On October 9, 2007, sixteen months after David filed his petition to modify in which he requested that the Harveys be given access to and visitation with CAIH based on his deployment, David testified that he was stationed in California, that he was not deployed, that he had not been deployed since he filed the petition to modify, and that he had not received any orders to be deployed. Because the evidence clearly demonstrates that David was not deployed as required by the statute, the trial court abused its discretion in awarding access and visitation to the Harveys under former section 153.3161 of the family code.[7] *See id.* We sustain this portion of Chassidie's second issue.

### B Failure to Intervene

Chassidie also argues that there was no other basis for the trial court to award the Harveys possession and access in the August 3, 2006[8] and October

---

[7]... The August 3, 2006 temporary orders recite that "[t]he parties have agreed to the terms of this order as evidenced by their signatures on the Associate Judge's recommendation on file in this cause." But nowhere in the associate judge's report, which Chassidie and her counsel signed, is section 153.3161 or David's possible deployment mentioned. Nor does the report contain any explicit "agreement" as to factual allegations that would support standing under the family code. *See, e.g.*, *Oryx Energy Co. v. Union Nat'l Bank of Tex.*, 895 S.W.2d 409, 416–17 (Tex. App.––San Antonio 1995, writ denied) (holding that signature underneath heading "Approved and Agreed," standing alone, does not establish consent judgment).

[8]... Chassidie refers to this order as the "July 19, 2006" order; however, although the hearing occurred on July 19, 2006, the date of the associate judge's report, the order memorializing the report was not signed by the trial court until August 3, 2006.

11

19, 2006 temporary orders because the Harveys had not filed any pleading to intervene in the suit at the time the trial court rendered those orders.

Texas Family Code section 153.432(a) allows a "biological or adoptive grandparent" to "request possession of or access to a grandchild by filing: (1) an original suit; or (2) a suit for modification as provided by Chapter 156." Tex. Fam. Code Ann. § 153.432(a) (Vernon 2008). A trial court abuses its discretion by awarding relief to a person who has not requested such relief in a live pleading. *See In re S.A.A.,* 279 S.W.3d 853, 856 (Tex. App.—Dallas 2009, no pet.); *In re Dukes*, No. 04-10-00257-CV, 2010 WL 1708251, at *2 (Tex App.—San Antonio Apr. 28, 2010, orig. proceeding) (mem. op.); *see also* Tex. R. Civ. P. 301.

Texas is a "fair notice" state, which means that all parties are entitled to fair notice of a claim. *See* Tex. R. Civ. P. 45, 47, 48, 50; *see generally Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 896–97 (Tex. 2000). The family code specifically require s parties to include in their pleadings a "statement describing what action the court is requested to take concerning the child and the statutory grounds on which the request is made." *See* Tex. Fam. Code Ann. § 102.008(b)(10) (Vernon 2008). Moreover, intervenors, like the Harveys, may intervene only by filing a pleading. *See* Tex. R. Civ. P. 60; *In re J.D.*, 304 S.W.3d 522, 525 (Tex. App.—Waco 2009, no pet.); *In re S.M.D.*, No. 04-08-00602-CV, 2010 WL 647876, at *4 (Tex. App.—San Antonio Feb. 24, 2009, no pet.).

The Harveys did not file any pleadings seeking access to or possession of CAIH until January 26, 2007 and had nothing on file; therefore, unless another

12

statute allowed such possession, the trial court abused its discretion by rendering the August and October 2006 orders granting the Harveys possession of CAIH. *See In re S.A.A.,* 279 S.W.3d at 856; *Dukes,* 2010 WL 1708251, at *2. We sustain the remainder of Chassidie's second issue.

### The Trial Court Abused its Discretion by Rendering the February 15, 2007 Temporary Orders and June 3, 2009 Order Granting the Harveys Possession of CAIH Because They Lacked Standing under the Family Code

Chassidie contends that the trial court abused its discretion by awarding access and possession to the Harveys after they filed their January 26, 2007 pleading requesting possession because the Harveys lack standing under family code sections 102.004 and 153.432. *See* Tex Fam. Code Ann. §§ 102.004, 153.432(a) (Vernon Supp. 2009).

### Applicable Law

Standing is implicit in the concept of subject matter jurisdiction. *See Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443 (Tex. 1993); *In re Kelso*, 266 S.W.3d 586, 590 (Tex. App.––Fort Worth 2008, orig. proceeding). A party's lack of standing deprives the trial court of subject matter jurisdiction and renders any trial court action void. *See Taub v. Aquila Sw. Pipeline Corp.*, 93 S.W.3d 451, 455 (Tex. App.—Houston [14th Dist.] 2002, no pet.). A party's standing to pursue a cause of action is reviewed de novo. *See In re Kelso*, 266 S.W.3d at 590; *Hobbs v. Van Stavern*, 249 S.W.3d 1, 3 (Tex. App.—Houston [1st Dist.] 2006, pet. denied); *In re C.R.P.*, 192 S.W.3d 823, 825 (Tex. App.—Fort Worth 2006, no pet.).

When standing has been conferred by statute, the statute itself should serve as the proper framework for a standing analysis. *See In re Sullivan*, 157 S.W.3d 911, 915 (Tex. App.—Houston [14th Dist.] 2005, orig. proceeding [mand. denied]). We review the trial court's interpretation of applicable statutes de novo. *See Johnson v. City of Fort Worth*, 774 S.W.2d 653, 656 (Tex. 1989). In construing a statute, our objective is to determine and give effect to the legislative intent. *See Nat'l Liab. & Fire Ins. Co. v. Allen*, 15 S.W.3d 525, 527 (Tex. 2000). If possible, we must ascertain that intent from the language the legislature used in the statute and not look to extraneous matters for an intent the statute does not state. *Id*. If the meaning of the statutory language is unambiguous, we adopt the interpretation supported by the plain meaning of the provision's words. *See St. Luke's Episcopal Hosp. v. Agbor*, 952 S.W.2d 503, 505 (Tex. 1997). We must not engage in forced or strained construction; instead, we must yield to the plain sense of the words the legislature chose. *See id.*

The interest of parents in the "care, custody, and control" of their children "is perhaps the oldest of the fundamental liberty interests" recognized by the United States Supreme Court. *See Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 2060 (2000). The natural right existing between parents and their children is one of constitutional dimensions. *See Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re C.T.H.S.*, 311 S.W.3d 204, 208 (Tex. App.—Beaumont 2010, pet. filed); *In re Pensom*, 126 S.W.3d 251, 254 (Tex. App.—San Antonio 2003, orig. proceeding). "These parental interests are a fundamental right

14

protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *Pensom*, 126 S.W.3d at 254 (citing *Troxel,* 530 U.S. at 65, 120 S. Ct. at 2060). "Texas statutes are intended by the Legislature to be in compliance with the Constitutions of this State and the United States." *In re K.K.C.,* 292 S.W.3d 788, 792 (Tex. App.—Beaumont 2009, no pet.) (citing Tex. Gov't Code Ann. § 311.021(1) (Vernon 2005)) (footnote omitted).

The power of a trial court to adjudicate disputes between a parent and a nonparent, and to enforce its own orders contrary to a parent's decisions concerning her children, constitutes state involvement that implicates the parent's fundamental liberty interests in the care, custody, and control of her children. *See Troxel*, 530 U.S. at 65–76, 120 S. Ct. at 2059–65. The jurisdictional requirement of standing helps ensure that a parent's constitutional rights are not needlessly interfered with through litigation. *See generally Pensom,* 126 S.W.3d at 255 ("[J]urisdictional prerequisite of standing [in the grandparent access context] serves to ensure that the statutory scheme is narrowly tailored so that a parent's personal affairs are not needlessly intruded upon or interrupted by the trauma of litigation by any third party seeking access."). As the United States Supreme Court explained in *Troxel*, "[S]o long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's

15

children." *Troxel,* 530 U.S. at 68–69, 120 S. Ct. at 2061 (citing *Reno v. Flores,* 507 U.S. 292, 304, 113 S. Ct. 1439, 1448 (1993)).

## A. Waiver of Standing

The Harveys argue that Chassidie has waived the right to complain about standing by her signature on the associate judge's July 19, 2006 report and by her attorney's agreement as to the form of the August 3, 2006 temporary order.[9] We disagree with both propositions.

Section 102.004(a)(2) of the family code requires that both parents either (1) file a petition requesting managing conservatorship for grandparents under that section or (2) consent to such a suit. Tex. Fam. Code Ann. § 102.004(a)(2). Neither Chassidie nor David had petitions on file requesting such relief. Nowhere on the associate judge's report does it reflect that Chassidie agreed that the Harveys have standing or that she agreed to underlying facts that would show their standing––thus consenting to their later intervention––or that she entered into an agreement with any of the other parties at the end of the July 19, 2006 contested hearing.[10] Her and her counsel's signatures on the associate judge's report appear to be no more than an agreement for Chassidie to attend counseling while David's petition requesting access under section 153.3161 of

---

[9] See note 7, *supra*.

[10] This case is thus distinguishable from *In re J.W.L.*, 291 S.W.3d 79, 85–86 (Tex. App.––Fort Worth 2009, orig. proceeding), in which the mother joined, and thus consented to, the grandparents' suit for managing conservatorship before she died during the pendency of the suit.

the family code was pending. In fact, the associate judge's report contemplates that the counselor could determine that the Harveys were not entitled to exercise David's possession and access at all pending the resolution of his suit. Thus, we conclude and hold that Chassidie's and her counsel's mere signatures alone on the July 19, 2006 associate judge's report do not constitute an agreed order conferring standing on the Harveys prior to their filing pleadings in intervention. *See, e.g.*, *Oryx Energy Co. v. Union Nat'l Bank of Tex.*, 895 S.W.2d 409, 416–17 (Tex. App.––San Antonio 1995, writ denied); *cf. In re D.C.*, 180 S.W.3d 647, 649–50 (Tex. App.––Waco 2005, no pet.) (holding that agreement as to "form and content" did not constitute agreed judgment).

Likewise, Chassidie's counsel's signature on the August 3, 2006 order memorializing the associate judge's July 19, 2006 report, under the heading, "APPROVED AS TO FORM ONLY," does not constitute an agreement that the Harveys had standing under section 102.004. *See In re Marriage of Jordan*, 264 S.W.3d 850, 853 (Tex. App.––Waco 2008, no pet.); *Baw v. Baw*, 949 S.W.2d 764, 766–67 (Tex. App.––Dallas 1997, no pet.).

We therefore conclude and hold that neither Chassidie's and her counsel's signatures on the July 19, 2006 report, nor her counsel's signature on the August 3, 2006 temporary orders, constitute an agreement by Chassidie that the Harveys had standing to seek grandparent possession and access or managing conservatorship as to CAIH.

**B. No Standing Under Family Code Section 153.432**

17

Chassidie argues that family code section 153.432 applies only to "biological or adoptive grandparents," and because the Harveys are neither, they lack standing to seek access. *See* Tex Fam. Code Ann. § 153.432(a). Section 153.432 confers standing only upon a "biological or adoptive grandparent" to file suits requesting possession of or access to a grandchild. *See id.* Chassidie testified that "Trey," not David, was CAIH's biological father.[11] Moreover, there is no evidence in the record establishing that David adopted CAIH. The evidence demonstrates that the Harveys are David's parents alone.[12] Because there is no evidence that the Harveys are CAIH's biological or adoptive grandparents, we hold that they lack standing to seek grandparent access under section 153.432 of the family code. *See id*; *Derzapf*, 219 S.W.3d at 331–32.

### C. No Standing under Family Code Section 102.004

[11] ... Cathy McGinnis, Amy Candler (a social worker), Chassidie, and Michael Russell (Chassidie's current husband) all testified about Chassidie's meeting with CAIH's biological father to determine if he would be willing to establish his paternity of CAIH and then relinquish his rights so that Michael could adopt CAIH. Chassidie and Michael testified that they were uneasy about approaching CAIH's biological father but did so based on the advice of their counsel, who has since resigned his Texas law license. The Harveys did not object to or challenge any of this testimony.

[12] ... Although the Harveys have not raised this issue, we note that David was CAIH's presumed father under the divorce decree. However, a presumed father is not necessarily a biological father, and our state statutes recognize this. *See In re Marriage of M.C.*, 65 S.W.3d 188, 191 (Tex. App. —Amarillo 2001, no pet.). The legislature knows how to word a statute to distinguish between a presumed and a biological parent. Thus, simply because David was a presumed father does not make the Harveys "biological" grandparents for purposes of family code section 153.432. Moreover, the Harveys chose to use CAIH's extremely limited contact with her biological father against Chassidie in this proceeding, which is tantamount to an admission that they are not CAIH's biological grandparents.

18

Chassidie also contends that the Harveys lacked standing under family code section 102.004. *See* Tex. Fam. Code Ann. § 102.004.

Section 102.004(a) states,

(a) In addition to the general standing to file suit provided by Section 102.003[13], *a grandparent, or another relative of the child related within the third degree by consanguinity*, may file an original suit requesting managing conservatorship if there is satisfactory proof to the court that:

(1) the order requested is necessary because the child's present circumstances would significantly impair the child's physical health or emotional development; or

(2) both parents, the surviving parent, or the managing conservator or custodian either filed the petition or consented to the suit.

*See id.* § 102.004(a) (emphasis added).

Chassidie contends that the Harveys lack standing because they are not grandparents and because they fail to meet the requirements of sections 102.004(a)(1).[14] We construe the standing statutes in a manner consistent with the constitutional principles stated in *Troxel. See Troxel,* 530 U.S. at 65–76, 120 S. Ct. at 2059–65; *Pensom,* 126 S.W.3d at 255–56. In the provision at issue here, the legislature chose the words, "a grandparent, or another relative of the child related within the third degree by consanguinity." *See* Tex. Fam. Code Ann. § 102.004(a) (emphasis added). Thus, the 2007 version, the version applicable

---

[13] ... The Harveys did not and have not asserted standing under any of the general provisions of section 102.003.

[14] ... We have already determined that the Harveys did not have standing under section 102.004(a)(2). *See, supra,* discussion under "A. Waiver of Standing."

19

here, conferred standing upon "a grandparent, or *another* relative of the child related within the third degree by consanguinity." *See* Act of May 28, 2007, 80th Leg., R.S., ch. 1406, § 2, 2007 Tex. Gen. Laws 4814, 4815 (emphasis added).

The Texas Government Code provides that "[t]wo individuals are related to each other by consanguinity if: (1) one is a descendant of the other; or (2) they share a common ancestor." *See* Tex. Gov't. Code Ann. § 573.023 (Vernon 2004). The Government Code also provides that "[t]wo individuals are related to each other by affinity if: (1) they are married to each other; or (2) the spouse of one of the individuals is related by consanguinity to the other individual. *See id*. § 573.024 (Vernon 2004).

We presume each word was used for a purpose, and give each word effect if it is reasonable and possible to do so. *See Tex. Workers' Comp. Ins. Fund v. Del Indus., Inc.*, 35 S.W.3d 591, 593 (Tex. 2000). By the inclusion of the word "another," the legislature made it clear that it intended for grandparents or other relatives to be limited to those individuals related to the child within the third degree of consanguinity. *See id.*; *see also Acker v. Tex. Water Comm'n*, 790 S.W.2d 299, 301 (Tex. 1990) ("A statute is presumed to have been enacted by the legislature with complete knowledge of the existing law and with reference to it."). Had the legislature not intended to limit the term "grandparent" to individuals related within the third degree by consanguinity, it would not have needed to includ the word, "another." Instead, the legislature could have phrased the section to read, "a grandparent or relative of the child related within the third

20

degree by consanguinity." *See Tex. Workers' Comp. Ins. Fund,* 35 S.W.3d at 593. Because there is no evidence that the Harveys were related to CAIH within three degrees of consanguinity, they lack standing under section 102.004(a). *See* Tex. Fam. Code Ann. § 102.004(a); *Derzapf,* 219 S.W.3d at 328 (holding that stepgrandfather, who was neither a biological nor an adoptive grandparent, lacked standing to seek access to stepgrandchildren); *A.M.S,* 277 S.W.3d at 98–99 (holding that stepuncle lacked standing under section 102.004).

Even if the Harveys could be considered "grandparents" under section 102.004(a), they still failed to overcome their burden to demonstrate that CAIH's then-present circumstances "would significantly impair [CAIH's] physical health or emotional development." *See* Tex. Fam. Code Ann. § 102.004(a)(1); *Derzapf,* 219 S.W.3d at 333; *In re M.J.G.,* 248 S.W.3d 753, 757 (Tex. App.—Fort Worth, 2008, no pet.).

The evidence at the hearings held in October 2007 was as follows: David testified that he was in the military and had been stationed in California since July 2005. He testified that the Harveys are his parents, that he would usually take CAIH to see them every other weekend prior to moving to California, and that he would talk to CAIH on the phone generally once a week after he moved to California. David testified that he contacted Chassidie and asked for extended visitation with CAIH in December 2005 and that the visitation lasted the entire week and a half that he was in Fort Worth. David then testified that problems arose in the spring of 2006 when his communications with Chassidie became

21

more sporadic, when she began not returning all of his telephone calls, and when he asked for extended summer visitation in a letter dated June 13, 2006. He testified that on June 15, 2006, he filed his petition to modify the parent-child relationship.

David testified that he was concerned when CAIH told him that he and his parents were strangers to her; however, he acknowledged that after only a few minutes CAIH went back to calling him Daddy and to calling the Harveys Grandma and Grandpa. He testified that CAIH told him that she had a new father and that she had also told him that Chassidie had told her that she has three fathers.

Chassidie testified that prior to David's moving to California in July 2005, he did not exercise standard visitation; instead, he chose to call her when he wanted to see CAIH, and they would arrange a visit. Chassidie testified that after David moved to California, the Harveys began to harass her family.[15] Specifically, the Harveys (1) would often go to Chassidie's house and leave messages on the door, (2) had blocked Chassidie and Michael's driveway and their garage on more than one occasion, and (3) showed up at Chassidie and Michael's house unannounced stating they would be exercising David's visitation even though David was not in Texas at the time. Chassidie testified that she

---

[15] Chassidie's husband, Michael, also corroborated the instances when the police were called to their residence to deal with the Harveys and testified that the Harveys told him that they were going to take CAIH away from Chassidie and Michael.

called the police and reported the Harveys' behavior because she feared for CAIH's safety. Chassidie testified that the Harveys had been involved in a physical altercation with her grandparents, the Greenwoods, which had also resulted in a police report. Chassidie testified that she did not receive David's June 6 or 13, 2006 summer visitation letters until June 29, 2006 because the stamp on the front of the letters indicated that they would be "available for pickup after 9:00 on the 29th." Chassidie admitted to having contacted CAIH's biological father, Trey, upon the advice of her then-attorney, Don Driver. She testified that she stopped at Trey's parent's house for about twenty to twenty-five minutes on her way to dinner. Chassidie testified that she received a call the next day after church and subsequently went with CAIH to Trey's parent's house where she introduced Trey as CAIH's biological father. Chassidie testified that the meeting lasted between one and a half to two hours.

Kim Cassidy, CAIH's first grade teacher at Norwood Elementary in Burleson during the 2006–2007 school year, testified that CAIH was a quiet, "easy going little girl" who was just like all the other girls and was "right on target" academically. Cassidy testified that CAIH told her that she was worried that the Harveys were going to try to kidnap her. She also testified that Chassidie had told her that she was in contact with CAIH's biological father and would attempt to terminate David's rights if "that is what it took." Cassidy testified that CAIH was always well groomed and on time. She testified that after the Harveys obtained custody of CAIH, CAIH told her that she missed her mother.

23

Shelly Grant, the owner of Performers Unlimited in Burleson, testified that she had known Chassidie since CAIH was three years old. She stated that CAIH had been participating in the gym's programs since she was three years old, when she started attending ballet and tap classes one night a week. She testified that CAIH later moved into gymnastics as well. Grant testified that CAIH attended Performers' summer camp in 2005 and that she attended classes every day after school beginning in the fall of 2005 until the Harveys removed her from the program in January 2007.

Grant testified that she believed Chassidie was an exemplary mother based on the way Chassidie interacted with CAIH, on how well-behaved and well-prepared CAIH was in class, and on her observations of Chassidie and CAIH over the course of four years. She testified that CAIH was a very likeable child with many friends and that she was happy and always well-groomed.

Grant also testified that CAIH was anxious, upset, and distraught over the visits with the Harveys and that CAIH had told her that she did not like visiting with the Harveys and had asked her why she had to visit with them. Grant testified that Chassidie and Michael were at every one of CAIH's performances. She testified that she had never seen David or either of the Harveys at any of CAIH's performances and that a list of all performance schedules was available on Performers' web page. Furthermore, Grant testified that she had never spoken to David or to Jan Harvey and that her only conversation with Ken Harvey was a phone conversation during the last week of January 2007 in which he

24

informed her that the Harveys had obtained custody of CAIH and that she would no longer be attending the program.

Cathy McGinnis, the court-ordered psychologist, testified that in her opinion, Chassidie was committing "grandparent alienation" of the Harveys because CAIH could tell that her mother did not like the Harveys. McGinnis based her opinion regarding alienation upon the various police reports filed by Chassidie alleging that the Harveys were harassing her family before the August 2006 and October 2006 temporary orders for access and possession were issued and the two police reports filed after the orders were issued. However, McGinnis acknowledged that it would not have been appropriate behavior for the Harveys to go to Chassidie's house uninvited and block her garage or driveway, to get into a physical altercation with Chassidie's grandparents, or to repeatedly go to Chassidie's house uninvited to leave messages. She also stated it would have been appropriate for Chassidie to ask the Harveys to stop the foregoing behavior.

McGinnis testified that Chassidie would not accept McGinnis's assessment that she was alienating the Harveys. She testified that she believed that Chassidie was making "poor progress" in being able to accept the Harveys' involvement in CAIH's life because she had only seen Chassidie "being somewhat cordial" with the Harveys at the time CAIH was brought into therapy with no other interaction between Chassidie and the Harveys.

However, McGinnis also acknowledged that she saw Chassidie and CAIH acting very affectionately with one another. Moreover, she also acknowledged

25

that CAIH frequently asked why she was taken away from her mother; asked when she would be able to return home; and told her that she missed her mother, her baby brother, and her stepfather; and said she wanted to go home. McGinnis also acknowledged that she believed that it was ideally in the best interest of every child to be with his or her mother rather than with grandparents.

When questioned about her background and training in grandparent alienation or parental alienation, McGinnis testified that she did not know about any literature discussing grandparent alienation, that she had not attended any seminars specifically addressing parental alienation, and that she was unable to give any details about training or education that she had received on the subject other than to generally state that parental alienation was discussed in play therapy workshops that she had attended. However, McGinnis asserted that she had researched parental alienation on the internet and had a file on the subject which contained the two articles she had found, one from Wikipedia and the other from Paskids.com.

Amy Candler, a social worker with Family Court Services, was asked by the court to give a recommendation as to custody of CAIH. She testified that she had not been retained to perform a social study and had based her oral recommendation to the trial court to grant possession of CAIH to the Harveys based on one interview each of the Harveys, McGinnis, and Chassidie. She testified that she had also made a visit to the Harveys' home and had made contact or had conversations with "Leslie" and Kim Cassidy, at Norwood

Elementary, Valerie and Renee Carr, Valarie Hearn, and the Johns, who were Trey's parents.[16] Candler acknowledged that she did not interview David, Michael, or CAIH or visit Chassidie and Michael's home prior to making her recommendation to the trial court. Candler testified that her recommendation was that "if the mother cannot encourage a relationship between the [Harveys] and [CAIH]" then the Harveys "need to be [CAIH's] primary caretakers until [Chassidie] can make some changes in the way that she handles the relationship between [CAIH] and other people that love her" and until Chassidie "learned how to share" CAIH with the Harveys.

Candler further testified that she had made the same recommendation in January 2007 and that she had also recommended that Chassidie be given supervised visitation of CAIH. Candler acknowledged that besides the one hour interview of Chassidie in January, she had only spoken to Chassidie on the phone twice and had "coincidentally" been in the family visitation room during one of Chassidie's visits with CAIH, where she saw the two being very affectionate with one another. Regardless, she testified that she had no information that would make her change her prior recommendation. She acknowledged that CAIH frequently asked why she was taken away from her mother, asked when she would be able to return home, and told her that she missed her baby brother, Michael, and Chassidie and wanted to go home. However, Candler testified, "I

---

[16] Candler did not elaborate on her conversations with these seven individuals or testify that any of these individuals provided her with information that led her to make her oral recommendation to the trial court.

27

can't recommend a change until someone provides me with enough information to determine or convince me that [Chassidie] is willing to share [CAIH] with the people she loves."

Candler testified that she was unaware of the five or six police reports for harassment and trespassing that Chassidie had filed against the Harveys and, had she known about the instances, those may have caused her to be concerned about the Harveys.

Phillip Hawkins, a social worker contracted by Family Services to supervise community visits between Chassidie and CAIH beginning in September 2007, testified that he had supervised six weekly visits between the two and that they were "significantly connected"; that CAIH was always delighted to see her mother; that CAIH was sad when Chassidie would leave at the end of the visits; and that CAIH would tell her mother that she loved her and that she missed her. Hawkins testified that he believed that Chassidie and CAIH were close based on his observations of the two interacting.

Our review of the entire record demonstrates that that there is no evidence that CAIH's circumstances in October 2007 would significantly impair her physical health or emotional development. The court-ordered psychologist and Family Court Services social worker both based all of their conclusions on Chassidie's refusing access and possession to the Harveys, who were never legally entitled to such. There was no evidence as to the effect of the supposed grandparent alienation on CAIH other than that she missed her mother when she was with the

28

Harveys. In this case, all of the focus was on the effect on the Harveys, which is not the intent of the statute, which focuses on the child and the child's best interest. *See* Tex. Fam. Code Ann. § 102.004(a). Accordingly, the trial court abused its discretion by determining that the Harveys had standing under section 102.004(a)(1) of the family code.[17] *See Derzapf*, 219 S.W.3d at 328; *M.J.G.*, 248 S.W.3d at 757. We sustain Chassidie's first issue. Because of our disposition of Chassidie's first two issues, we need not address her third issue. *See* Tex. R. App. P. 47.1.

## Conclusion

Having concluded that the trial court abused its discretion by determining that the Harveys had standing and by entering the August 3, 2006, October 19, 2006, February 15, 2007, and June 3, 2009 orders, we conditionally grant Chassidie's petition for writ of mandamus and order the trial court to vacate its August 3, 2006, October 19, 2006, February 15, 2007 and June 3, 2009 orders and to dismiss the pleadings filed by the Harveys for lack of standing. We order the Harveys to immediately return CAIH and all of her personal belongings to Chassidie at her residence at 908 Mistflower Avenue, Burleson, Johnson County, Texas, 76028, no later than **5:00 p.m. on Friday, August 27, 2010.**[18]

---

[17] For the same reasons the Harveys did not have standing to intervene under section 102.004(b). *See* Tex. Fam. Code Ann. § 102.004(b).

[18] Our judgment will issue in duplicate; one version will identify CAIH by initials as in this opinion, and another will identify her by her full name in the event a nonparty must rely on it to enforce our judgment.

Chassidie's request for attorney's fees remains pending in the trial court.  Only if the trial court fails to comply with this court's order will we issue the writ.

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; MCCOY and MEIER, JJ.

DELIVERED:  August 25, 2010