

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-16-00127-CV

IN THE INTEREST OF L.M., A
CHILD

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 323-99886J-14

----------

## MEMORANDUM OPINION[1]

----------

Appellants Mother and Father appeal the termination of their parental rights to L.M., the child who is the subject of this suit.  We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

**Background**

## I. Mother

L.M. is Mother's ninth child but her first child with Father. At the time of trial in this case, Mother did not have possession of any of her nine children[2] and had been the subject of thirteen Child Protective Services (CPS) investigations in Texas and Oklahoma, largely as a result of her drug abuse.

### A. Mother's drug abuse and criminal history

Mother's drug abuse started at a young age. She started using drugs around the age of twelve, and she started using crack cocaine, her drug of choice, when she was seventeen years old. She also experimented with methamphetamine and pills. At least three of her children, including L.M., tested positive for cocaine when they were born. Although at trial Mother claimed that she had been sober since April 2014, she also admitted that she continued to drink alcohol occasionally. Mother admitted to engaging in a continuing course of endangering her children as a result of her drug use.

Mother's criminal history included the following:

- In 2002, Mother received two convictions in Oklahoma for attempted robbery with a dangerous weapon, for which she was sentenced to ten years' confinement. At the time, she was working as an exotic dancer and she planned the robberies with a man she met at the club in which she danced.[3] She served three years in prison before

---

[2]Two of her children had died. It is not clear from the record what happened to three of Mother's children.

[3]After the failed robberies, Mother's accomplice murdered the manager of the strip club where Mother was working at the time.

receiving parole.  She violated the terms of parole three years later by leaving Oklahoma and was arrested in Granbury, extradited to Oklahoma, and sentenced to additional community service, which she completed.

- In April 2008, Mother was convicted for prostitution.

- In May 2013, Mother was arrested for possession of a controlled substance.  That charge was later dismissed.

- In October 2015, Mother received a citation for an open container violation after she and Father were pulled over and investigated for driving while intoxicated (DWI).  Mother, the passenger, failed a field sobriety test and was determined to be intoxicated by the investigating officer.  At the time of trial, she did not know the status of that charge.

- At the time of trial, there was an active warrant for Mother's arrest related to outstanding tickets for driving a vehicle without brake lights and driving without a driver's license.

## B. The Franklin children

Mother's parental rights to three of her children, two boys and a girl who were collectively referred to as the "Franklin[4] children" throughout the trial, were terminated in April or May of 2014.

All three of the Franklin children made outcries of sexual abuse to their foster mother after they were taken into custody by the Department of Family and Protective Services (DFPS).  The female child, M.F., was only six years old at the time of the outcry and alleged that Mother as well as Mother's friends and boyfriends had sexually abused her and forced her to work as a prostitute in

---

[4]In accordance with rule 9.8, we refer to children and family members, including adoptive and foster parents, by aliases or initials.  Tex. R. App. P. 9.8(b) & cmt.

3

order to obtain drugs. M.F. said that she was penetrated anally and vaginally to the point that she was bleeding and that, once, Mother threw a washcloth at her and told her to clean herself up. M.F. also said that she was shot with needles, that she was forced to have sex with Mother and her uncle at the same time, and that she was forced to have sex with her brothers.

The older of the two Franklin boys was seven years old when he told T.G., the foster mother who later adopted both boys, but not M.F., that he was forced to have sex with Mother, a man he referred to as "Uncle Spud," and other strangers.[5] The younger Franklin son made an outcry when he was five years old that strangers and his Uncle Spud had penetrated his anus with "things" and that he was forced to perform oral sex and have oral sex performed upon him.

The children continued to have behavioral problems and act out after termination. The daughter had required hospitalization three or four times even after the termination. T.G. testified that after she picked up M.F. from M.F.'s previous foster home, M.F. masturbated in the backseat of the car. She testified that M.F., who was six years old at the time, would bang her head against walls and scream, put objects inside her vagina and anus, open her mouth and attempt to kiss her foster mother with her tongue, proposition men at the grocery store and the park, and masturbate in public. One of the boys told T.G. that M.F. had been having sex with the dog and that M.F. had forced him to have sex with her,

---

[5]T.G. testified that one of the boys described the strangers as "people that were paying [Mother]."

4

threatening to kill him if he did not. M.F., who reportedly was "hearing voices," was diagnosed with attachment disorder, Attention Deficit Hyperactivity Disorder (ADHD), trauma, and Post-Traumatic Stress Disorder (PTSD). At the time of trial in this case, M.F. was eight years old and was living in her third foster care placement since leaving T.G.'s home. She continued to struggle in school and was receiving therapy on a weekly basis, along with several special education services at school.

The Franklin boys also received ongoing counseling. The older Franklin son, who was nine at the time of trial, was depressed, suicidal, and suffering from PTSD. He was taking two different antidepressants as of the time of trial but reportedly still had a lot of anger. The younger Franklin son, who was six at the time of trial, also suffered from PTSD as well as attachment and anger issues and behavioral issues at school.

Although Mother denied sexually abusing any of the Franklin children, she admitted that she was "completely" responsible for their severe psychological issues, which, according to Mother, were caused by her failure to protect them from her continuing pattern of abusing drugs. Mother also admitted that even though Uncle Spud had been investigated for sexually abusing another family member, she still allowed him to be around the Franklin children. Mother admitted to making some "horrible decisions" but assured the court that Uncle Spud was no longer in her life. Despite a CPS investigation concluding that there

5

was no "reason to believe" that Mother had sexually assaulted M.F., her parental rights to the children were terminated after a trial in April 2014.

The day after the Franklin termination trial ended in April 2014, Mother tested positive for cocaine.

## II. Father

Father also had a history of significant drug abuse and a more extensive criminal history than Mother. Additionally, Father had been diagnosed with a number of mental illnesses that limited his ability to work outside the home.

### A. Father's drug abuse and criminal history

Father dropped out of school in the sixth grade and became involved in dealing drugs and "hustling" beginning in the late 1980s and continuing into to the early 2000s. His criminal history included the following:

- In October of 1988, Father was charged with delivery of a controlled substance, cocaine.

- In November 1988, Father was again charged with delivery of a controlled substance, cocaine.

- In November 1988, Father was charged with possession of a controlled substance, cocaine, with intent to deliver.

- In March 1989, Father was charged with assault with a deadly weapon.

- In November 1989, Father was charged with attempted murder.

- In December 1989, Father was charged with possession of a controlled substance, cocaine, with the intent to deliver.

- In May 1990, Father was charged with aggravated assault causing bodily injury.

6

- In January 1990, Father pleaded guilty to the 1988 delivery charges.  He was sentenced to ten years' imprisonment for each conviction.  Father entered a plea in bar to the remaining drug charges he had accrued from 1988 through 1990.

- In August 1990, Father pleaded guilty to the charge of aggravated assault causing serious bodily injury and was sentenced to five years' confinement.  His guilty plea was entered as part of a plea in bar to the pending charges against him for attempted murder and aggravated assault with a deadly weapon.

- Father served one year of his two ten-year sentences and one five-year sentence, which ran concurrently, and was released from prison on parole in January 1991.

- In February 1991, one month after he was released from prison, Father was arrested for possession of a controlled substance.  That charge was later dropped.

- In August 1994, Father was convicted of failing to identify himself to a police officer and sentenced to 45 days' confinement.

- In October 1994, Father was convicted of possession of marijuana and sentenced to 15 days' confinement and a $300 fine.

- In January 1995, Father was arrested for theft.

- In March 1996, Father was charged with possession of cocaine with the intent to deliver.  The charge was dismissed pursuant to a plea in bar in connection with a later charge for escape made in 1996.

- Also in March 1996, Father was charged with illegally possessing a firearm.  That charge was dismissed because there was insufficient evidence to support the charge.

- In December 1996, Father was arrested and charged with possession of cocaine.  He pleaded guilty to the charge, was convicted, and was sentenced to fifteen years' confinement.

- Also in December 1996, Father was arrested and charged for escape. He pleaded guilty, was convicted, and was sentenced to fifteen years' imprisonment.[6]

- In September 2007, Father was charged with possession of cocaine, pleaded guilty, and was convicted. He was sentenced to two years' confinement.

- In October 2015, Father was arrested and charged with DWI. Earlier that morning, Father had appeared in court for a hearing in this case. At the trial of this termination case, Father claimed that the attorney ad litem in this case had set up this arrest and that the police were working for the ad litem; he said he refused the blood alcohol test because he was afraid the police "might . . . shoot [him] up with something to show [he was] dirty." Father's driver's license was suspended for 180 days for refusal to take the blood alcohol test. That suspension was still in effect at the time of trial.

Additionally, Father tested positive for cocaine in January 2014 and in March 2014, shortly after L.M. was taken into custody by DFPS.

**B. Father's family**

Father admitted that his brother, sister, niece, and nephew, with whom he had frequent contact, had criminal histories. Another brother, K., also had a criminal history, but Father denied that K. was part of his life, even though K. lent Mother and Father a truck to drive periodically, including during the trial.

Father had two children from a previous relationship, a son and a daughter, but he was not involved in either of their lives because he had been in prison during most of their youth. Father testified that the reason he had not attempted to find his son after release from prison was because the child's

---

[6]When asked at trial if he would be surprised to know that he had received at least thirty traffic citations between 1988 and 1996, Father responded, "I was just young running wild."

mother had taken him to Lewisville or Carrollton and that he did not know how to get to his son's location, saying, "[I]f I don't know the directions of going way across town, I mean that kind of throws me for a loop."

Although he testified that he wanted his relationship with L.M. to be different from his relationship with his two other children, Father did not know L.M.'s birthday when asked at trial. When asked who would care for L.M. if something happened to him, Father responded that he "got nieces," but he did not know their names and admitted that he had never socialized with them.

### C. Father's disabilities

At the time of trial, Father received $733 a month in social security disability income due to certain mental illnesses.[7] Father had been diagnosed with manic depression "with psychotic features," antisocial disorder, and mild mental retardation. He testified that because of his antisocial disorder, he did not like to communicate with people on a regular basis. He testified that when he had a psychotic episode, he would "[try] to get out around people that [he] know[s] that's not right." He took medication to help with his mental health conditions but admitted that he occasionally mixed alcohol with his medications, which he knew he was not supposed to do.

---

[7]Father did not have any other steady source of income, although he sometimes mowed lawns for money and occasionally worked for his brother or borrowed money from his brother.

**III. L.M.**

L.M. was born while the Franklin termination proceedings were pending. Although CPS was monitoring Mother at the time of L.M.'s birth, they lost track of her. To avoid drug tests and home visits by CPS, Mother lied to CPS, claiming that she and L.M. were in Oklahoma, but in fact during the twenty-seven days that Mother had custody of L.M. after his birth, she and L.M. moved from place to place, staying "a few nights here and there." She admitted at trial that she lied to CPS about where she was living because she did not "feel compelled to hand [her] kid over."

Mother and Father were eventually located at the parole office by a DFPS special investigator. The investigator later met up with Mother and Father at Father's sister's home, and while the investigator was speaking to Father outside, Mother escaped with L.M. through the back door.

L.M. was finally taken into custody by DFPS on March 17, 2014, after DFPS located him and Mother at Father's house. Mother and Father both tested positive for drugs after L.M. was taken into custody. He was placed in foster care that evening with Kendall and Jordan.

**A. L.M.'s health issues**

Kendall, one of the foster parents, described L.M. as having severe diarrhea and being "very jerky, very rigid, . . . very, very tight" when they received him. L.M. tested positive for cocaine not long after he was taken into custody. Neither Mother nor Father offered any explanation as to why L.M. tested positive

for cocaine, but both insinuated at trial that it was the fault of DFPS or the foster parents.

L.M. was diagnosed with a number of significant health issues after he was taken into custody. He suffers from severe gastrointestinal issues, including food allergies. The foster parents engaged in a considerable amount of trial and error to determine what would cause his gastroenteritis to flare and stated that it could take "weeks and months" for a flare to settle back down. Sometimes, L.M. would appear to be able to tolerate a food and then later not be able to tolerate the same food. They switched formulas four times before finding one that, at the time of trial, he could tolerate. In addition to using a specialized formula, the foster parents specialized L.M.'s diet to provide extra calories and added gas drops into his drinks. According to Kendall, L.M.'s gastroenterologist expected L.M.'s gastrointestinal issues to continue in the future. Mother and Father participated in some of the gastroenterology appointments, and on those occasions, the doctor would explain L.M.'s symptoms and the effects of his disorder to them.

L.M. was also diagnosed with obstructive sleep apnea and central sleep apnea and received treatment from an ear, nose, and throat (ENT) doctor and two pulmonologists for these conditions. In October 2014, L.M. underwent surgery to remove his tonsils and adenoids in an attempt to diminish his obstructive sleep apnea. Kendall testified that Father initially told the ENT that he was opposed to the surgery, but when the physician explained to Father that

11

L.M. could die from obstructive sleep apnea, it appeared to Kendall that Father understood the ENT's explanation. However, two months after the surgery had taken place, while attending an appointment with L.M.'s pulmonologist to discuss L.M.'s sleep apnea, Father claimed that he did not recall sleep apnea ever having been discussed before, and he persisted in this claim even after Kendall reminded him of their conversation with the ENT. Later in the same appointment, Father claimed that the ENT had not explained that the sleep apnea could kill L.M. but that a nurse had.

L.M. had also been diagnosed with dystonia by two neurologists. Kendall explained dystonia as a serious neurological disease that affected L.M.'s ability to control his muscles because "the brain [was] sending incorrect signals to certain muscle groups," causing "fluctuating tone." The dystonia affected his ability to control his legs or his shoulders and also caused L.M. to tire easily, which made him grumpy. L.M. received occupational and physical therapy for his dystonia, sometimes eight to ten times a month. He also wore orthopedics for his legs, a brace on each ankle, and a taller brace that he used when he was experiencing problems with his right leg failing, which generally occurred in the evenings.

Kendall testified that the dystonia had been discussed with Mother and Father in an appointment with the neurosurgeon and that the ENT had also discussed dystonia with Father. Kendall testified that both Mother and Father demonstrated that they understood the explanations of L.M.'s conditions by the

12

neurosurgeon and the ENT, and they asked questions of the doctors. Mother was able to explain some basics about dystonia when asked about it at trial, but Father could not describe its effects.

In addition to the dystonia, L.M. suffered from "Abnormal Involuntary Movement" (AIM), also referred to as Dyskinesis, which Kendall described as "more problematic" and quite severe. AIM caused L.M. to have uncontrollable full body movement, lasting for ten to twenty seconds. Kendall testified that L.M. was experiencing more frequent episodes of AIM, which caused his whole body to shudder uncontrollably. She also testified that the dystonia and AIM caused L.M. to fall down frequently. Kendall testified that because of her concern that AIM could lead to severe problems for L.M. in the future, she hoped to take him to the Mayo Clinic to investigate clinical trials that might be available as a source of treatment for the disorder.

L.M. was also diagnosed with spinal issues, which Kendall described as a "fatty filum" and a "tethered cord" that caused additional pain and could lead to nerve damage, scoliosis, and compressed discs in the future. L.M.'s neurosurgeon, Dr. Honeycutt, had recommended surgery to cut the fatty filum in an effort to release tension on the spinal cord. According to Kendall, Dr. Honeycutt had described the condition of L.M.'s spine and the proposed surgery to Mother and Father in great detail, expressing the risks of the surgery as minimal and explaining that without surgery, L.M.'s spinal issues could become

significantly worse, possibly leading to loss of use of his limbs.[8] Dr. Honeycutt even drew pictures of the spine as part of his explanation to Mother and Father. After the detailed explanation, however, Mother and Father were not in favor of the surgery but wanted second opinions, although both admitted that they had made no effort to obtain a second opinion.[9] According to Kendall, Dr. Honeycutt was the second opinion because a prior doctor had already diagnosed L.M. with these spinal issues during an appointment that Mother and Father had also attended.

L.M. was referred to a developmental pediatrician at the Child Study Center in September of 2015 because of concerns about hyperactivity and possible autism. Kendall testified that Father attended that appointment[10] but Mother did not. Kendall testified that the developmental pediatrician determined that L.M. "currently does not qualify under the autism spectrum" but he did "qualify as an overactive child," meaning that he would likely be diagnosed with Attention-Deficit/Hyperactivity Disorder (ADHD). The doctor also diagnosed him with mixed receptive-expressive language disorder, which required speech therapy three times a week. Craig Knight, a CASA representative that attended

---

[8]According to Kendall, L.M.'s gastroenterologist had indicated that this surgery could have a positive effect on L.M.'s gastrological issues as well.

[9]At the time of trial, DFPS had not approved the surgery because L.M.'s condition was not considered life-threatening.

[10]Father was accompanied by two unidentified females at that appointment.

14

the appointment with the developmental pediatrician, observed that although Father was present at the assessment, he did not interact with the examining physician by asking questions, providing information, or participating in the assessment in any other manner.

Kendall described L.M. as a "sweet, opinionated, happy, on-the-move boy who has an attitude" and who tires easily and is a picky eater. He had sleep issues, sleeping only about four-and-a-half hours at a time and taking one 45-minute to one-hour nap a day. At the time of trial, L.M. was taking Clonidine to help his muscles relax at night, painkillers for nerve pain—including Gabapentin to specifically ease his spinal pain—and melatonin to help him sleep. L.M. had doctor's appointments at least twice a month and sometimes as often as once a week. He attended therapy three to five days a week, sometimes in his foster home and sometimes in therapy facilities. Additionally, the foster parents administered a daily therapy regimen at home, as directed by L.M.'s specialists, including sensory therapy and massage therapy to relax his muscles. From the time DFPS had taken custody of L.M. until the time of trial, L.M. had been taken to the ER twice, undergone two MRI's, stayed overnight in the hospital for his sleep apnea surgery, and had submitted to a sleep study.

At trial, neither Mother nor Father could identify any medications that L.M. was taking, nor could they identify any of L.M.'s doctors or describe his treatment or therapy schedules. In total, Mother had attended only three of twelve appointments that she had the opportunity to attend. Father had attended eight

15

of the twelve he was permitted to attend. Kendall testified that if L.M.'s treatments and therapies were not maintained, there was a good chance that he would become permanently disabled and confined to a wheelchair, have a stroke, lose the ability to control his muscles, not learn how to speak properly, and be in a lot of pain.

### B. Mother's and Father's interactions with L.M.

Knight, a supervisor for CASA of Tarrant County and licensed professional counselor, testified at trial about his observations of Mother's and Father's visits with L.M. Since L.M. was taken into custody by DFPS, Knight had observed 23 supervised parent visits between L.M. and Mother and Father and had visited L.M. approximately twelve or fourteen times at his foster parent's home.

Knight described L.M.'s supervised visits with Father as "generally appropriate." For the six to eight months before trial, the visits occurred at Chuck E. Cheese, and Knight described Father as being attentive, smiling, and seeming amused by L.M. According to Knight, L.M. recognized Father and appeared comfortable and safe around him. He described Mother as attentive, but observed that she did not personally interact with L.M. as much as Father. Knight thought that the bond between L.M. and Father seemed stronger than the bond between L.M. and Mother. But Knight also noted that L.M. appeared to feel safe with both.

Although Knight felt that L.M. and his parents had appropriate and positive interactions during the supervised visits, he still expressed concern about their

16

ability to care for L.M. Knight recounted a supervised visit in which Mother gave L.M. food[11] that subsequently caused L.M. a great deal of distress—including diarrhea and vomiting—and weight loss,[12] and put him at risk of hospitalization. Knight recalled another instance when Father arrived at a supervised visit accompanied by his nephews without having obtained pre-approval of the extra visitors, a situation that to Knight demonstrated a lack of ability to plan ahead.

Another visitation supervisor testified about a December 2014 visit when she noticed that Father smelled like alcohol. She informed Chevy Levels, the CPS caseworker that handled this case, who spoke to Father about it, but she also noted that Father was not exhibiting any behavior that caused her to end the visit earlier than its scheduled time.

## IV. The termination proceedings

On March 17, 2014, DFPS filed a petition to terminate the parent-child relationship between L.M. and Mother and Father.[13] Initially, DFPS's goal was to reunite L.M. with Mother and Father, with a concurrent goal of placing L.M. with a relative. Family Service Plans were put in place, and Mother and Father were both given a number of tasks to complete, including classes, drug abuse

---

[11]Knight explained that because of L.M.'s gastrointestinal issues and his food sensitivities, during visitations he was permitted to eat only food that had been provided by his foster parents.

[12]L.M. lost three pounds.

[13]In April 2015, the attorney ad litem for L.M. filed a petition to terminate the parent-child relationship between L.M. and Mother and Father.

recovery programs, attendance at visitations with L.M., and refraining from any criminal activities or illegal acts.

On November 7, 2014, the foster parents filed a petition in intervention in the suit seeking termination of Mother and Father's rights and appointment as possessory conservators.

On March 3, 2015, the parties agreed to, and the court entered, an "Agreed Order for Actions Necessary for Parent to Obtain Return of Child." In it, the court ordered that Mother (1) comply with all requests for random drug testing, (2) attend Narcotics Anonymous or Alcohol Anonymous meetings at least twice a week and obtain a sponsor, and (3) develop a written Substance Abuse Relapse Prevention Plan. Father was ordered to (1) comply with all requests for random drug testing, (2) attend Narcotics Anonymous or Alcohol Anonymous meetings at least twice a week and obtain a sponsor, (3) develop a written Substance Abuse Relapse Prevention Plan, and (4) follow through with Tarrant County Mental Health and Mental Retardation on a monthly basis, follow all recommendations, and take all medications prescribed to him.

**A. July 2015 hearing and motion for monitored return**

This case was initially set for trial on Tuesday, July 15, 2015. On the Thursday before that trial setting, DFPS filed a motion for monitored return of L.M. to Mother and Father, and the parties agreed to proceed on July 15 on the attorney ad litem's and the foster parents' petitions to terminate as well as DFPS's motion for monitored return. Levels, who in addition to acting as the

18

CPS caseworker for this case also handled the Franklin investigation, testified at the July hearing that she would be comfortable returning L.M. to Mother and Father.

Levels admitted that none of her concerns that had existed at the time of the Franklin trial had changed as of July 2015, such as the existence of the sexual abuse allegations, the fact that Mother did not have custody of any of her eight other children, and her concerns about Father, his drug use, and his extensive criminal history. Nevertheless, Levels testified that she felt that either Mother or Father could successfully raise L.M. on their own because they had been sober for almost a year, Mother was better about communicating with CPS than she had been during the Franklin investigation, and they had demonstrated that they would be able to care for L.M. Levels testified that Mother behaved differently in her visits with L.M. than she had when visiting the Franklin children, interacting more and engaging more with L.M., although she conceded that these observations had occurred in a supervised environment for only four hours each month.

Levels also acknowledged Father's mental health conditions, including the fact that he experienced hallucinations, but indicated that she was not concerned about his ability to raise L.M. if he continued to properly manage his mental health issues with medication. She admitted, however, that she had not spoken to anyone at Mental Health and Mental Retardation who had actually treated Father. Levels admitted that Mother and Father had not, at that point, been to

19

any of L.M.'s doctor's appointments or been involved in his medical care, but she also felt that DFPS could have done more to facilitate their involvement.

By the end of the July hearing, Levels was the only witness that had testified and had only testified on direct examination by the attorney for the intervening foster parents.[14]

## B.  March 2016 continuation of final trial

The final hearing did not resume until March 2016, but in January 2016, the trial court found in a permanency hearing order that neither Mother nor Father had demonstrated adequate and appropriate compliance with their service plans.  In addition to testimony by Mother, Father, T.G., and Kendall to the facts recited above, the court heard testimony from Levels and Knight regarding their observations of Mother and Father.

By the time of the March 2016 hearing, Levels had changed her stance, testifying that termination—not reunification with Mother and Father—was in L.M.'s best interest.  Levels testified that during a home visit in November 2015, she had learned of Father's October 2015 DWI arrest and the suspension of his

---

[14]It is unclear from the record why Levels was the only witness to be heard on July 15, 2015.  The trial was rescheduled for November 18–19, 2015. On the day before the November trial setting, Father requested a continuance on the basis that L.M.'s maternal grandfather was a member of the Creek Nation and that this American Indian ancestry subjected L.M. to the requirements of the Indian Child Welfare Act.  The notices required under the ICWA were subsequently given, and the trial setting was again continued and rescheduled for March 21, 2016.

driver's license. According to Levels, Father claimed that his license was suspended because of a conspiracy involving the attorney ad litem in this case.

Following that visit to the home and the discovery of the DWI arrest, Levels decided that the permanency goal for L.M. would no longer be a monitored return to the parents but, instead, a termination of parental rights. After this violation, Levels was concerned that Mother and Father had not refrained from criminal activity during the pendency of the termination proceedings and that they had not remained sober during the proceedings.

Knight also expressed his belief that it was in L.M.'s best interest that Mother's and Father's rights be terminated. He testified that he thought Father's rights should be terminated because of his history of mental health issues,[15] Father's failure to make appointments with his mental health professionals, and his failure to reschedule make-up appointments for missed sessions. He expressed additional concern over Father's ability to care for L.M. in light of L.M.'s serious medical issues. By way of example, Knight pointed to an event while L.M. was in the foster parent's care when L.M. had been stung by an insect

---

[15]Knight testified that Father's antisocial personality disorder can present "a long-standing pattern of behavior, criteria including putting oneself and others at risk, impulsive behavior, diminished capacity for insight or guilt, . . . lack of empathy for others, often times using aggression or intimidation to meet their own needs, not—not adhering to general standards, laws, mores that other aspects of society typically do." He admitted that he had not seen any of those symptoms manifested in Father's behavior at visits but testified that anecdotal evidence in the case file supported the diagnosis, including Father's long-standing pattern of substance abuse and violence, his prior incarceration, and the evasiveness on Father's part before L.M. was removed from the home.

21

and experienced an allergic reaction that required immediate medical attention, expressing doubt that Father would have provided the appropriate care in that circumstance. Knight also postulated that L.M.'s medical circumstances would necessitate ongoing diagnosis and treatment requiring diligence in scheduling and attending medical appointments and following through with medical recommendations, a skill that Knight believed Father lacked. He expressed concern over Father's difficulty with reading and navigating to unfamiliar locations and how those limitations could affect Father's ability to manage L.M.'s serious medical issues. He did not feel that Father would be able to make important medical decisions for L.M. on a consistent basis because his mental illnesses hindered his ability to think ahead and make good decisions. Knight further testified that Father's day-to-day capacity to function could be impaired by the hallucinations he experiences due to the major depressive disorder with psychotic features from which Father suffers.

To Knight, Father's October 2015 DWI charge indicated that Father would "risk his ability to raise [L.M.] and potential termination of his parental rights for one half a beer" and that Father's judgment was not in L.M.'s best interest. He also cautioned that, at some point in the future, L.M. might be prescribed a medication that Mother or Father could sell on the street.

In sum, Knight was concerned that Father was unable to make and keep appointments, that he was not appropriately aware of potential and active circumstances that could be detrimental to L.M., and that he had not

22

demonstrated a knowledge of the multiple physicians that were treating L.M. on an ongoing basis or of the medications that L.M. was to be taking. He also expressed concern about Mother's and Father's abilities to obtain insurance coverage for L.M. and to pay for ongoing and most likely increasing medical attention.

## C. Termination

On March 21–23, 2016, the final trial was completed, and the trial court found clear and convincing evidence that the termination of their rights was in the best interest of the child.[16] With regard to Mother, the court found by clear and convincing evidence that she had knowingly placed or knowingly allowed L.M. to remain in conditions or surroundings that endangered his physical or emotional well-being, engaged in conduct or knowingly placed L.M. with persons who engaged in conduct which endangered his physical or emotional well-being, had her parent-child relationship terminated with respect to another child based on a finding that her conduct violated section 161.001(b)(1)(D) or (E) of the family code, and that she failed to comply with the provisions of a court order establishing the actions necessary for her to be awarded custody of L.M. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (M), (O) (West Supp. 2016).

Regarding Father, the court found that he had knowingly placed or knowingly allowed L.M. to remain in conditions or surroundings that endangered

---

[16]The court terminated Mother's and Father's parental rights by order dated April 12, 2016.

his physical or emotional well-being, engaged in conduct or knowingly placed L.M. with persons who engaged in conduct which endangered his physical or emotional well-being, and that he failed to comply with the provisions of a court order establishing the actions necessary for him to be awarded custody of L.M. *Id.* § 161.001(b)(1)(D), (E), (O).

## Discussion

### I. Mother

Mother's appellate counsel filed an *Anders* brief and a motion to withdraw, declaring that there are no arguable issues and that any appeal by Mother would be frivolous. *See Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396 (1967); *In re K.M.*, 98 S.W.3d 774, 776–77 (Tex. App.—Fort Worth 2003, no pet.) (holding that *Anders* procedures apply in parental termination cases). The brief meets the requirements of *Anders* by presenting a professional evaluation of the record and demonstrating why there are no arguable grounds to be advanced on appeal. Although given the opportunity, Mother did not file a response.

As the reviewing appellate court, we must independently examine the record to decide whether counsel is correct in determining that an appeal in this case is frivolous. *See Stafford v. State*, 813 S.W.2d 503, 511 (Tex. Crim. App. 1991); *In re K.R.C.*, 346 S.W.3d 618, 619 (Tex. App.—El Paso 2009, no pet.). Having carefully reviewed the record and the *Anders* briefs, we agree with counsel that the appeal is frivolous. *See K.R.C.*, 346 S.W.3d at 619. We find

24

nothing in the record that might arguably support mother's appeal. *See In re D.D.*, 279 S.W.3d 849, 850 (Tex. App.—Dallas 2009, pet. denied).

Accordingly, we affirm the trial court's termination of Mother's parental rights to L.M.

However, we deny the motion to withdraw filed by Mother's counsel in light of *In re P.M.* because it does not show "good cause" other than counsel's determination that an appeal would be frivolous. *See* No. 15-0171, 2016 WL 1274748, at *3–4 (Tex. Apr. 1, 2016) ("[A]n *Anders* motion to withdraw brought in the court of appeals, in the absence of additional grounds for withdrawal, may be premature."); *see also In re C.J.*, No. 02-16-00143-CV, 2016 WL 4491231, at *1 (Tex. App.—Fort Worth Aug. 26, 2016, no pet. h.) (denying a motion for withdrawal in light of *In re P.M.* where it did not show "good cause" other than counsels' determination that an appeal would be frivolous); *In re A.M.*, No. 01-16-00130-CV, 2016 WL 4055030, at *7 & n.2 (Tex. App.—Houston [1st Dist.] July 28, 2016, no pet.) (noting that since *In re P.M.* was handed down, "most courts of appeals affirming parental termination orders after receiving *Anders* briefs have denied the attorney's motion to withdraw"). The supreme court has held that in cases such as this, "appointed counsel's obligations [in the supreme court] can be satisfied by filing a petition for review that satisfies the standards for an *Anders* brief." *P.M.*, 2016 WL 1274748, at *3.

25

## II. Father

Father brings two issues on appeal. First, Father argues that the trial court erred in failing to strike the foster parents' plea in intervention because the foster parents lacked standing to intervene in the termination proceedings. In his second issue, Father challenges the sufficiency of the evidence supporting the trial court's finding that termination was in the best interest of the child.

### A. Intervenors' standing

In his first issue, Father argues that the intervening foster parents did not have standing to intervene in the termination suit. Father admits that he did not raise this issue at trial, but standing is a component of subject matter jurisdiction that we must address even if it was not raised in the trial court. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443 (Tex. 1993); *see also In re H.L.*, No. 02-14-00388-CV, 2016 WL 354080, at *5 n.13 (Tex. App.—Fort Worth Jan. 28, 2016, pet. denied) (mem. op.) (addressing issue of uncle's standing under section 102.004(b) even though it was not raised in the trial court); *Mauldin v. Clements*, 428 S.W.3d 247, 263 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (same). We review an issue of standing de novo. *Mauldin*, 428 S.W.3d at 262. When, as here, the trial court does not make separate findings of fact and conclusions of law, we imply the findings necessary to support the judgment. *Id.* (citing *In re S.M.D.*, 329 S.W.3d 8, 13 (Tex. App.—San Antonio 2010, pet. dism'd)). We review the entire record to determine if the trial court's implied findings are supported by any evidence. *Id.*

Kendall and Jordan filed their petition in intervention on November 7, 2014, and alleged that they had standing to intervene pursuant to sections 102.003(a)(12) and (b), and 102.004(b) of the family code. Tex. Fam. Code Ann. §§ 102.003(a)(12), 102.003(b), (West Supp. 2016), 102.004(b) (West 2014). In an attached affidavit, the foster parents asserted that L.M. was placed in their home in March 2014 as a foster child and had been in their sole custody since then with the exception of bi-weekly visits with Mother and Father. The affidavit also described the extensive criminal and drug histories of Mother and Father, Mother's history of multiple parental terminations, and the allegations of abuse made against Mother.

The foster parents cannot rely on section 102.003(a)(12) to confer standing because they did not have custody of L.M. for at least twelve months before they petitioned to intervene. *Id.* § 102.003(a)(12)(requiring that a foster parent have possession of a child for at least twelve months prior to the filing of an original suit). At the time that the foster parents filed their petition in November 2014, they had only had possession of L.M. since March 2014, less than twelve months. Nor did they acquire standing under section 102.003(b). This subsection merely provides that the court may not require the time of possession be continuous in determining if the intervening foster parent has had possession of the child for at least twelve months. *Id.* § 102.003(b).

Thus, it was the foster parents' burden to establish standing under section 102.004(b) by a preponderance of the evidence. *See Mauldin*, 428 S.W.3d at

262; *see also In re Russell*, 321 S.W.3d 846, 860 (Tex. App.—Fort Worth 2010, orig. proceeding). Under section 102.004(b), the foster parents had standing to intervene if they had substantial past conduct and "there [wa]s satisfactory proof to the court that appointment of a parent as a sole managing conservator or both parents as joint managing conservators would significantly impair the child's physical health or emotional development." *Id.* § 102.004(b). Father only disputes the first prong of 102.004(b)'s standing provision, arguing that the foster parents did not have "substantial past contact" with L.M. We disagree.

When they filed their petition, the foster parents had been responsible for the daily care of L.M. for almost eight of the nine months of his entire life. There is no statutory definition of "substantial past contact," but other courts have held that it was established in circumstances similar to this case and even in cases of contact for a shorter duration. *See In re A.L.W.*, No. 02-11-00480-CV, 2012 WL 5439008, at *5 (Tex. App.—Fort Worth Nov. 8, 2012, pet. denied) (mem. op.) (holding substantial past conduct was shown where child had been living in foster parents' home fulltime for almost seven weeks); *In re A.M.*, 60 S.W.3d 166, 169 (Tex. App.—Houston [1st Dist.] 2001, no pet.) (holding substantial past contact was shown where foster parents had cared for child for more than 80 percent of her lifetime). The foster parents' fulltime care of L.M. for 34 out of 39 weeks of L.M.'s life constituted "substantial past contact."

Even if we were to determine that the evidence did not support a finding that the foster parents had standing to intervene, Father has not demonstrated

28

any harm caused by their intervention.  To obtain reversal of a judgment based upon an error in the trial court, the appellant must show that the error occurred and that it probably caused rendition of an improper judgment or probably prevented the appellant from properly presenting the case to this court.  Tex. R. App. P. 44.1(a); *Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212, 225 (Tex. 2005); *see also Jabri v. Alsayyed*, 145 S.W.3d 660, 672 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (holding trial court's erroneous refusal to strike intervention was harmless and therefore did not warrant reversal).

The order terminating Mother and Father's parental rights does not confer any rights on the foster parents, such as awarding them custody or a conservatorship over L.M.  The order awards DFPS a permanent managing conservatorship over L.M.  In fact, other than reciting that the foster parents appeared at trial as parties to the suit, the final order in this case did not mention them again.  Thus, we fail to see how any alleged error by the trial court in not sua sponte striking the foster parents' intervention was harmful.  We overrule Father's first issue.

## B.  Sufficiency of the evidence of best interest of the child

In his second issue, Father argues that the evidence was factually and legally insufficient to support the trial court's finding that termination of his parental rights was in the best interest of L.M.  Father admits in his brief that the evidence supported "at least one" of the grounds for termination under section

29

161.001(b)(1), and he limits his argument to the evidence supporting the determination of best interest of the child.

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2014); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *E.R.*, 385 S.W.3d at 554–55; *Holick*, 685 S.W.2d at 20–21.

Termination decisions must be supported by clear and convincing evidence. *See* Tex. Fam. Code Ann. § 161.001(b), § 161.206(a) (West 2014); *E.N.C.*, 384 S.W.3d at 802. "[C]onjecture is not enough." *E.N.C.*, 384 S.W.3d at 810. Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also E.N.C.*, 384 S.W.3d at 802. Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the

30

allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *E.N.C.*, 384 S.W.3d at 802.

For a trial court to terminate a parent-child relationship, the party seeking termination must establish by clear and convincing evidence that the parent's actions satisfy one ground listed in family code section 161.001(b)(1) and that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b); *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re C.D.E.*, 391 S.W.3d 287, 295 (Tex. App.—Fort Worth 2012, no pet.).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the challenged ground for termination was proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence

31

unless a reasonable factfinder could not. *See id.* "A lack of evidence does not constitute clear and convincing evidence." *E.N.C.*, 384 S.W.3d at 808.

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses because that is the factfinder's province. *J.P.B.*, 180 S.W.3d at 573–74. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

We are required to perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support the termination of a parent-child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the trial court's judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). We review the entire record to determine the child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). The same evidence may be probative of both the subsection (1) ground and best interest. *Id.* at 249; *C.H.*, 89 S.W.3d at 28. Nonexclusive factors that the trier of fact in a termination case may also use in determining the best interest of the child include

(A) the desires of the child;

(B) the emotional and physical needs of the child now and in the future;

(C) the emotional and physical danger to the child now and in the future;

(D) the parental abilities of the individuals seeking custody;

(E) the programs available to assist these individuals to promote the best interest of the child;

(F) the plans for the child by these individuals or by the agency seeking custody;

(G) the stability of the home or proposed placement;

(H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I) any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best interest finding, "we consider, among other evidence, the *Holley* factors"); *E.N.C.*, 384 S.W.3d at 807.

33

These factors are not exhaustive, and some listed factors may be inapplicable to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.* That is, "[a] lack of evidence does not constitute clear and convincing evidence." *E.N.C.*, 384 S.W.3d at 808.

## A. Emotional and physical needs and danger

In this case, there was substantial evidence that L.M. has high emotional and physical needs and will continue to have those needs in the future and also that any failure to properly meet his medical needs could result in serious physical danger to L.M. now and in the future. L.M. has a number of significant health concerns that require daily attention, including gastroenteritis, dystonia, AIM, sleep apnea, and spinal issues. At the time of trial, L.M. received therapy three to five times a week and at-home therapy on a daily basis. He was under the care and treatment of multiple doctors, including a pediatrician, a developmental pediatrician, pulmonologists, neurologists, and a gastroenterologist, requiring recurring visits, as often as once a week.

As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). Additionally, in this case, failure to manage L.M.'s conditions and maintain the necessary

therapy and medication regimens could result in physical pain and serious physical harm to L.M., possibly leaving him without the use of his limbs, leaving him bound to a wheelchair, causing him to have a stroke, or causing him not to learn how to speak properly. When questioned at trial regarding his son's medical needs, Father demonstrated only vague awareness of L.M.'s medical needs. He did not know what medications L.M. was taking[17] and he could not name any of L.M.'s doctors or therapists. When a parent, whether by indifference, ignorance, or incapacity, cannot attend to his child's medical needs, a danger is posed to the child's emotional and physical well-being. This danger manifested itself here, when, after being in the care of Mother and Father, both of whom tested positive for cocaine, L.M., hardly a month old, also tested positive for the drug. Exposure to drug use in general—and most certainly the ingestion of cocaine—endangers a child's health and needs. *See, e.g.*, *In re D.S.*, 176 S.W.3d 873, 879 (Tex. App.—Fort Worth 2005, no pet.) (holding that evidence of a parent's unstable lifestyle, including drug use and inability to provide a stable home, can support a factfinder's conclusion that termination is in the child's best interest), *superseded by statute on other grounds as recognized by In re D.A.R.*, 201 S.W.3d 229, 230–31 (Tex. App.—Fort Worth 2006, no pet.).

"'[J]ust as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional

---

[17]In fact, Father could not even remember the names of his own medications at trial.

and physical interests of the child not be sacrificed merely to preserve that right.'" *E.C.R.*, 402 S.W.3d at 240 (quoting *C.H.*, 89 S.W.3d at 26). Evidence that Father could not meet L.M.'s physical and emotional needs weighed in favor of termination.

## B. Father's parental abilities

In considering the factor of Father's parental abilities, Father argues that he has not had a substantial opportunity to demonstrate his abilities because L.M. was taken from his custody when L.M. was less than one-month old. He also relies on observations by Knight that Father's supervised interactions with L.M. were positive, that Father was attentive to the child, and that L.M. appeared comfortable with him. Lastly, Father argues that he has demonstrated his parenting abilities by successfully completing the tasks set for him by DFPS, including attending parenting classes, maintaining a suitable home, attending counseling, attending AA and NA meetings, and complying with random drug tests.

While there is evidence that Father complied with these tasks as required by DFPS, he was also required to refrain from using drugs or drinking alcohol and to avoid engaging in any criminal behavior. By Father's own admission, he violated this requirement when he consumed alcohol in October 2015 and was subsequently arrested for DWI.

As discussed in relation to the factor considering L.M.'s physical and emotional needs, Father knew little about L.M.'s serious medical needs and how

36

to properly care for him, a fact that could be construed as a lack of parental ability as well. Additionally, evidence of Father's extensive criminal history and drug abuse are relevant to evaluating his parental abilities. *In re J.F.*, No. 02-08-00183-CV, 2009 WL 806889, at *8 (Tex. App.—Fort Worth Mar. 26, 2009, pet. denied) (mem. op.); *D.S.*, 176 S.W.3d at 879; *see also In re S.B.*, 207 S.W.3d 877, 886 (Tex. App.—Fort Worth 2006, no pet.) (noting that parent's poor judgment may be considered in determining child's best interest). This factor weighs in favor of termination.

### C. Father's plans for the child

All of Father's plans, as described at trial as well as in in his brief on appeal, reflect his and Mother's desire to raise L.M. together and include Mother's involvement in caring for L.M. Father planned to take care of L.M. when Mother was working and proposed that Mother would take care of L.M. when she was not working and that they would live in Father's home together. Mother's parental rights were terminated, and we affirmed that result by holding her appeal of that termination is frivolous. Therefore, Father's plans to involve Mother as a caregiver for L.M. cannot be in the child's best interest. The only alternative offered by Father at trial was his assertion that he "got nieces" that would care for L.M. if something happened to him, but he admitted that he did not know his nieces' names and did not socialize with them. This is not a viable alternative plan. This factor therefore weighed in favor of terminating Father's parental rights.

## D. Father's acts or omissions and any excuses therefor

Admittedly, Father completed most of the tasks required by DFPS in its service plan. However, Father violated the terms of that service plan by drinking alcohol, and was at least charged with DWI. He then attempted to blame his DWI on an alleged conspiracy between the attorney ad litem in this case and the police that arrested him, without any evidence of such a conspiracy existing. Additionally, Father tested positive for cocaine, as did L.M., a month after L.M. was born. When asked about L.M.'s positive drug test, Father insinuated that it was the fault of CPS or the foster parents, which the trial court could have interpreted as another refusal to accept responsibility for his own actions. This would weigh in favor of termination. For instance, in the case of *In re L.C.*, the mother blamed other people who were "out to get her" for her trouble with DFPS, even though she admitted to regular alcohol abuse and using drugs before her children were removed from her custody and she tested positive for cocaine shortly after their removal. 145 S.W.3d 790, 800 (Tex. App.—Texarkana 2004, no pet.). The Texarkana court considered her "blame-shifting and conspiracy theories" as illustrations of her failure to take responsibility for her actions and inactions. *Id.* Likewise, Father's refusal to take responsibility for his own actions is a factor weighing in favor of termination.

Based on our review of the entire record, we conclude that the trial court could have reasonably formed a firm conviction or belief that termination of Father's rights was in L.M.'s best interest. Therefore, we hold that the evidence

is legally and factually sufficient to support the trial court's finding that termination is in L.M.'s best interest. Accordingly, we overrule Father's second issue.

## Conclusion

We deny the motion to withdraw filed by Mother's counsel in light of *In re P.M.*, 2016 WL 1274748, at *3–4. Having held that Mother's appeal is frivolous and having overruled each of Father's issues, we affirm the trial court's judgment terminating Mother's and Father's parental rights to L.M.

/s/ Bonnie Sudderth
BONNIE SUDDERTH
JUSTICE

PANEL: MEIER, GABRIEL, and SUDDERTH, JJ.

DELIVERED: October 13, 2016