

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-21-00409-CV

———————————————————

IN RE S.W., RELATOR

On Appeal from the 393rd District Court
Denton County, Texas
Trial Court No. 17-2228-393

Before Bassel, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Wallach

## MEMORANDUM OPINION

In this mandamus action, relator Mother complains of the trial court's denial of her motion to dismiss the intervention petition filed by real party in interest paternal Grandmother and its temporary orders granting Grandmother possessory conservatorship and possession and access in a suit affecting the parent-child relationship (SAPCR) regarding Mother's daughter B.T.[1] Mother argues that the trial court abused its discretion by denying her motion because (1) Grandmother did not have standing to intervene and (2) Grandmother did not overcome Mother's constitutional right to the fit-parent presumption. We conditionally grant Mother's mandamus petition because we agree that Grandmother did not establish standing to intervene.[2]

## Background

### Factual and Procedural Background

Mother and Father were teenagers when B.T. was born in 2016. In August of 2017, the trial court entered a final decree that appointed Mother and Father as B.T.'s joint managing conservators, with Father having the exclusive right to determine B.T.'s primary residence. For approximately the first two years of her life, B.T. lived

---

[1]We refer to the child using her initials and to other family members by their relationship to the child. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2]Having conditionally granted Mother's petition on the issue of standing, we need not consider her constitutional argument. *See* Tex. R. App. P. 47.1.

with Mother and Father in Grandmother's home. During this time, Father spent eight months in jail and started an additional seven-year prison sentence in January 2019. Mother and B.T. continued to live with Grandmother until August 2019 when they moved out of Grandmother's home and into a separate residence.

After Father started his seven-year prison sentence, Mother filed a modification petition seeking sole managing conservatorship of B.T. on June 17, 2021. Grandmother then filed a petition in intervention that sought appointment as joint managing conservator with the right to determine B.T.'s primary residence or, alternatively, possession of and access to B.T., and temporary orders for the same. In seeking conservatorship, Grandmother alleged that the "appointment of the parents of the child as managing conservators would not be in the best interest of the child because the parents' present circumstances would significantly impair the child's physical health or emotional development."[3] In seeking possession and access, Grandmother alleged that "the denial of possession of or access to the child by [Grandmother] would significantly impair the child's physical health or emotional well-being."[4]

In support of her petition, Grandmother attached an affidavit alleging that:

- Mother was exposing B.T. to unsafe conditions;

---

[3] *See* Tex. Fam. Code Ann. § 102.004.

[4] *See id.* § 153.432.

3

- Mother and B.T. lived with Grandmother from 2017 until the fall of 2019;

- Grandmother had cared extensively for B.T. for most of B.T.'s life, mainly while Mother was at work and often overnight;

- Grandmother had helped pay for and transport B.T. to and from daycare;

- Grandmother had provided B.T. with health insurance and bought B.T. clothing and other necessities;

- In September 2019, B.T. was required to get stitches while in Mother's care after being hit with a car door above her eye;

- In June 2020, B.T. ingested mother's birth control pills while in Mother's care;

- In May 2020, B.T. received third-degree burns on her chest while in Mother's care;

- In January 2021, B.T. attempted to cook food in the microwave, which resulted in a "big smoke out in the kitchen from it burning";

- In January 2021, Mother left B.T. in a cousin's care who transported B.T. in the front seat of a car without a car seat;

- At a June 2021 visit with Grandmother, B.T. "was hungry, scratching her hair repeatedly as it had not been washed," and had just had an overnight stay at the house of Mother's friend;

- Mother had allowed B.T. to sleep in a bed with maternal grandmother and maternal grandmother's boyfriend; and

- Grandmother and B.T. have a "close emotional bond" and B.T. relies on Grandmother to be a consistent caretaker and comforter, both "financially and psychologically."

Grandmother further attested that B.T.'s "well-being is in imminent and material danger and this court should not wait for something else to happen to [her] granddaughter or it may be the last time."

4

In response to Grandmother's intervention, Mother filed a motion to dismiss Grandmother's intervention for lack of standing, which the trial court initially denied on July 7, 2021. On July 9, 2021, Mother filed an amended motion to dismiss, again arguing that Grandmother lacked standing to intervene. At the July 12, 2021 temporary-orders hearing, Mother again raised her standing complaint, and the trial court heard testimony on the issue.

**Temporary-Orders Hearing on July 12, 2021**

**Mother's Testimony**

Mother explained that she and B.T. lived with Grandmother from B.T.'s birth until August 2019, when she and B.T. moved into their own apartment. Mother stated that B.T. had her own bedroom and that B.T. had lived with her continuously since they moved out of Grandmother's home. According to Mother, B.T. had not lived with Grandmother since August 2019 and does not have her own bedroom when she stays at Grandmother's overnight.

Mother testified that for a time, B.T. was in daycare while Mother worked; Mother and Grandmother split the cost of the daycare. But after daycare became too expensive, the decision was made in September 2019 for Grandmother to watch B.T. at Grandmother's home. At first, this required Grandmother to watch B.T. during the day, five days per week. However, after Mother started a new job in March 2021 that required her to work night shifts, B.T. would stay overnight at Grandmother's house

5

approximately three nights per week. Mother did not drop B.T. off at Grandmother's house with the intent to leave her there permanently.

Mother testified that she made the decision in April or May 2021 for her family to watch B.T. rather than Grandmother due to a strained relationship between Mother and Grandmother. Grandmother often cussed at Mother in text exchanges between the two women, which made it difficult for Mother to leave B.T. in her care: "It just - - it wasn't in the best interest of [B.T.] . . . ." But Mother explained that she had not cut off contact between B.T. and Grandmother—in the month before the temporary-orders hearing, B.T. and Grandmother had spoken on the phone between four and seven times and had visited at least once in person. Mother stated that she had "never had an issue" with B.T. spending time with Grandmother and that she had "let [B.T.] see [Grandmother] even though all this stuff has been going on," but she also noted that this was not something she was required to do.

Mother confirmed that B.T. had received stitches two or three years ago. She explained that B.T. had tried to run into a parking lot, and, when Mother grabbed her, "[B.T.] swung her head back and hit her - - underneath her eyebrow on the door." As to Grandmother's allegation that B.T. had ingested birth control pills, Mother testified that B.T. had in fact accessed the pills from a low cabinet in Mother's apartment, but Mother did not know if B.T. had actually ingested them. Mother called her sister—an ICU nurse—and poison control, who told Mother to monitor B.T. from home.

6

However, Mother took B.T. to the hospital "just to get her checked out and she was fine."

Mother also stated that, more than a year ago, B.T. had been burned after she accidentally spilled soup on herself. Mother treated the burn at home with ointment, and B.T. was not diagnosed with third-degree burns. Concerning Grandmother's allegation about the "big smoke out" in the kitchen, Mother explained that she had been cooking popcorn in the microwave and B.T. "must have pressed more time on the microwave," causing the popcorn to burn.

As to leaving B.T. with friends, Mother stated that this occurred on one occasion when her own mother was unavailable to watch B.T. Mother confirmed that her cousin had transported B.T. in a car without a car seat but disputed that B.T. had ever shown up to a visit with Grandmother with dirty hair. Mother also testified that, when she learned it was a possibility that B.T. might be sleeping in the same bed as maternal grandmother and maternal grandmother's boyfriend, she asked that the boyfriend leave the room.

Mother explained that other than B.T. expressing a strong desire not to attend two visits with Grandmother, B.T.'s recent behavior had been exactly as it had always been—no growth regression, bedwetting, or despondency.

**Maternal Grandmother's Testimony**

Maternal grandmother testified that B.T.'s demeanor and behavior had not changed or been odd in the three or four months before the hearing. For the last two

7

or three months, maternal grandmother had been watching B.T. in her home while Mother was at work.

**Grandmother's Testimony**

Grandmother acknowledged that she had not been present for any of the incidents alleged in her affidavit. She stated that Mother and B.T. lived in her home from October 2016 until August 24, 2019, when they moved out: "I helped her move out of my house. I literally picked up things." After Mother and B.T. moved out, Mother would drop B.T. off at Grandmother's house before work and pick B.T. up when her shift ended.

When asked how often she took care of B.T. from 2016 until May 2021, Grandmother responded: "Very consistently, every week. There has not been a time that I have been away from B.T. physically more than two days." During that time, she had often cared for B.T. four to five days a week. When Mother started a new job in March 2021, there were days during which she saw B.T. for only three or four hours because Mother worked the night shift. Grandmother also watched B.T. at other times, including when Mother was at school, on vacation, or "needed a break."

Grandmother voiced concerns that Mother was incapable of caring for B.T. without Grandmother's help. She worried that Mother was leaving B.T. with various different people during the day in place of Grandmother. At one person's house, B.T. caught head lice. When asked if she had concerns about B.T.'s emotional

development if B.T. did not have regular access to Grandmother, Grandmother responded:

> Yes, because I provide her with stability. I provide her with patience. I have witnessed [Mother] continuously yelling at her. [B.T.] fights her. [B.T.] has thrown a rock at the back of her head. [Mother] has called me on FaceTime crying. She said [B.T.] threw her phone in her face and busted her lip. They're always fighting.
>
> I have been the one to settle things and get [B.T.] to mind and to listen and to comply with her.

At a recent visit with Grandmother, B.T. "was her normal self" and "was happy" and tried to convince Grandmother not to return her to Mother at the conclusion of the visit. According to Grandmother, B.T. had at one time called her "mom" before Father had instructed B.T. to call her "nana."

**Trial Court's Temporary Orders**

At the conclusion of the temporary-orders hearing, the trial court named Mother temporary sole managing conservator and Father and Grandmother temporary possessory conservators and also granted Grandmother visitation with B.T. In making its oral ruling, the court stated:

> THE COURT: Okay. Number one, I find that the mother is a fit mother. I'm sure there's incidents with the child. We all have incidents. My mother burnt my hand with an iron. It was an accident. Accidents happen.
>
> . . .
>
> THE COURT: But I find the - - for what it's worth, I find a - - the young mother like I said, I found her fit. In fact, in many ways she's made some - - not the greatest life choices, but she's - - as many of us

9

didn't do - - but she's working to recover from them, and I find that commendable. So, what I'm trying to do is make it clear I find she's a fit parent.

The court reasoned that granting access to Grandmother was appropriate because B.T. and Grandmother were affectionate and bonded with each other and because B.T. "[a]t one point maybe was even confusing [Grandmother] with the mother." Quoting the concurrence in *In re C.J.C.*, 603 S.W.3d 804 (Tex. 2020), and the Stevens dissent in *Troxel v. Granville*, 530 U.S. 57, 99, 120 S. Ct. 2054, 2078 (2000), the trial court added that ceasing contact between a child and a grandparent whom the child views as a parent or attachment figure "may have a dramatic, and even traumatic, effect" or create "significant psychological harm" on a child's well-being.

In its written temporary orders signed on September 30, 2021, the trial court found that (1) it had jurisdiction over the case and parties; (2) Mother was a fit parent entitled to the fit-parent presumption; and (3) Grandmother had standing under section 102.003(a)(9) of the family code.

Mother filed this petition for writ of mandamus along with a motion for emergency temporary relief to stay the trial. In her mandamus petition, Mother claims the trial court abused its discretion by (1) denying Mother's motion to dismiss Grandmother's conservatorship claim, (2) denying Mother's motion to dismiss Grandmother's claim for possession and access, and (3) granting Grandmother temporary access to B.T. Grandmother responded, without legal support or citation to the record, that she did, in fact, establish standing under section 102.003(a)(9) and

10

that Mother is not entitled to mandamus relief because she unjustifiably delayed the filing of her mandamus petition.

## Availability of Remedy

We grant the extraordinary relief of mandamus only when the trial court has clearly abused its discretion and the relator lacks an adequate appellate remedy. *In re Team Rocket, L.P.*, 256 S.W.3d 257, 259 (Tex. 2008) (orig. proceeding); *see In re State*, 355 S.W.3d 611, 613 (Tex. 2011) (orig. proceeding). A trial court has no discretion in determining what the law is or in applying the law to the particular facts. *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135 (Tex. 2004) (orig. proceeding).

Mandamus relief is permissible when a trial court erroneously denies a motion to strike a petition in intervention. *In re Clay*, No. 02-18-00404-CV, 2019 WL 545722, at *3 (Tex. App.—Fort Worth Feb. 12, 2019, orig. proceeding [mand. denied]) (mem. op.). Further, because "an order denying a motion to dismiss for lack of standing in a [SAPCR] is not appealable," there is no adequate remedy at law. *In re McDaniel*, 408 S.W.3d 389, 396 (Tex. App.—Houston [1st Dist.] 2011, orig. proceeding) (citing *In re Roxsane R.*, 249 S.W.3d 764, 775 (Tex. App.—Fort Worth 2008, orig. proceeding)). Thus, mandamus relief is appropriate when a trial court clearly misapplies the law regarding standing in ruling on a petition in intervention. *Clay*, 2019 WL 545722 at * 3.

## Standing

The issue of standing is a question of law that we review de novo. *In re H.S.*, 550 S.W.3d 151, 155 (Tex. 2018). A party's lack of standing deprives the trial court of subject-matter jurisdiction and renders any court action void. *In re Russell*, 321 S.W.3d 846, 856 (Tex. App.—Fort Worth 2010, orig. proceeding [mand. denied]). If a petitioner lacks standing to assert a claim, the trial court must dismiss that claim for lack of jurisdiction. *Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 153 (Tex. 2012); *In re H.L.*, 613 S.W.3d 722, 724 (Tex. App.—Fort Worth 2020, no pet.).

When standing has been conferred by statute, the statute itself serves as the proper framework for a standing analysis. *See Hunt v. Bass*, 664 S.W.2d 323, 324 (Tex. 1984). A party seeking relief in a SAPCR must allege and establish standing within the parameters of the language used in the relevant family code provisions. *H.L.*, 613 S.W.3d at 724.

An analysis of whether a party has standing begins with the petitioner's live pleadings, and we construe the pleadings in petitioner's favor. *See Jasek v. Tex. Dep't of Fam. & Protective Servs.*, 348 S.W.3d 523, 527 (Tex. App.—Austin 2011, no pet.). However, we must also consider evidence the parties presented below that is relevant to the jurisdictional issues, including any evidence that a party has presented to negate the existence of facts alleged in the petitioner's pleading. *H.S.*, 550 S.W.3d at 155; *see Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 227 (Tex. 2004). If the facts

12

relevant to jurisdiction are undisputed, the jurisdictional determination is a matter of law. *See Miranda,* 133 S.W.3d at 228.

**No Standing Under § 102.003(a)(9)**

The trial court found that Grandmother had standing under family code section 102.003(a)(9).

### Legal Requirements for Standing Under § 102.003(a)(9)

Section 102.003(a)(9) confers standing on a nonparent to file an original SAPCR[5] who "has had actual care, control, and possession of the child for at least six months ending not more than 90 days preceding the date of the filing of the petition." Tex. Fam. Code Ann. § 102.003(a)(9). Section 102.003(b) provides that "[i]n computing the time necessary for standing under [subsection (a)(9)], the court . . . shall consider the child's principal residence during the relevant time preceding the date of commencement of the suit." *Id.* § 102.003(b).

Interpreting these sections jointly, the Texas Supreme Court has held that nonparents cannot establish standing under section 102.003(a)(9) if they did not share a principal residence with the child for the statutorily-required time period "regardless of how extensively they participate[d] in caring for her." *H.S.*, 550 S.W.3d at 156. The court specifically excluded "babysitters, daycare providers, friends, and relatives who

---

[5]Texas courts have held that, if a person has standing under 102.003(a)(9), then they "generally may instead file a petition in intervention" as Grandmother did here. *In re J.A.T.*, 502 S.W.3d 834, 837 (Tex. App.—Houston [14th. Dist] 2016, no pet.).

assist with childcare responsibilities but do not share a principal residence with the child" from the category of persons upon whom such standing can be conferred. *Id.* at 156 n.7.

Courts are to determine a child's principal residence by looking at the following factors: (1) whether the child has a fixed place of abode within the possession of the party, (2) occupied or intended to be occupied consistently over a substantial period of time, and (3) which is permanent rather than temporary. *In re Kelso*, 266 S.W.3d 586, 590 (Tex. App.—Fort Worth 2008, no pet.).

**Analysis**

Accordingly, to meet her burden to allege facts demonstrating standing under section 102.003(a)(9), Grandmother had to show that her home was B.T.'s principal residence in which they lived together for at least six months ending not more than 90 days before Grandmother filed her original petition in intervention on July 6, 2021. *See* Tex. Fam. Code Ann. § 102.003(a)(9).

It is undisputed that Grandmother did not meet this burden. Though B.T. and Mother resided with Grandmother for the first two years of B.T.'s life, the pleadings and evidence established conclusively that they moved out of Grandmother's home and into their own apartment in August 2019. Grandmother herself confirmed this in both her affidavit and testimony.

Rather than alleging that B.T. resided with her after August 2019, Grandmother instead alleged that she had substantial, consistent possession of B.T.—often

14

watching the child five days per week—due to being the primary childcare provider while Mother worked. Mother would drop B.T. off at Grandmother's home before work and retrieve her after Mother's shift ended—a daily routine in which Mother never intended to leave B.T. at Grandmother's house permanently. In other words, Grandmother assisted extensively with childcare responsibilities, but B.T. never resided with Grandmother after August 2019. This lands squarely within the categories set forth by the supreme court to illustrate when a person does *not* have standing under section 102.003(a)(9). *See H.S.*, 550 S.W.3d at 156 n.7.

Because B.T. and Grandmother did not share a fixed, permanent abode together for at least six months ending not more than 90 days before July 6, 2021, Grandmother does not have standing under section 102.003(a)(9). *See In re Kelso*, 266 S.W.3d at 590. The trial court abused its discretion in finding otherwise.

**No Standing Under § 102.004**

Mother next argues that the trial court abused its discretion by not dismissing Grandmother's claim for managing conservatorship of B.T. for lack of standing under family code section 102.004. We agree.

**Legal Requirements for Standing Under § 102.004**

Section 102.004 confers standing on a grandparent to request managing conservatorship "if there is satisfactory proof to the court that . . . the order requested is necessary because the child's present circumstances would significantly impair the child's physical health or emotional development." Tex. Fam. Code Ann. § 102.004(a).

15

**Analysis**

To show significant impairment, Grandmother alleged in her affidavit that B.T. was in "imminent and material danger" while in Mother's care and cited seven supporting incidents: B.T.'s getting stitches after hitting her eye on a car door; B.T.'s ingesting Mother's birth-control pills; B.T.'s obtaining a third-degree burn on her chest; there having been a "big smoke-out" from burned food; B.T.'s riding in a car with Mother's cousin without a car seat; B.T.'s being dirty when she arrived to visit with Grandmother; and B.T.'s sleeping in a bed with maternal grandmother and maternal grandmother's boyfriend. Additionally, Grandmother testified that she was concerned with Mother leaving B.T. in the care of several of Mother's friends, which led to B.T. catching head lice.

However, Grandmother admitted that she was not present at any of the seven incidents and did not dispute Mother's testimony explaining each incident. In fact, Mother's explanation for each incident led the trial court to characterize them as "accidents." The trial court then repeatedly asserted that Mother was a fit parent, left B.T. in Mother's care, named Mother as B.T.'s temporary sole managing conservator, and found that Grandmother had standing only under section 102.003(a)(9), which confers standing without a need to show significant impairment.

Viewing the entirety of the evidence, and because we have already held that Grandmother does not have standing under 102.003(a)(9), we hold that the trial court abused its discretion by not dismissing Grandmother's conservatorship claim.

16

**No Standing Under § 153.432**

Finally, Mother argues that Grandmother lacked standing under family code section 153.432, and thus, the trial court abused its discretion by not dismissing Grandmother's claim for possession of and access to B.T., by naming Grandmother temporary possessory conservator, and by granting Grandmother temporary access to B.T. Again, we agree.

**Legal Requirements for Standing Under § 153.432**

Section 153.432 of the family code confers standing on a grandparent to petition for possession of and access to a grandchild, but only if the grandparent attaches an affidavit "that contains, along with supporting facts, the allegation that denial of possession of or access to the child by the petitioner would significantly impair the child's physical health or emotional well-being." Tex. Fam. Code Ann. § 153.432(c); *see H.L.*, 613 S.W.3d at 724. "A trial court abuses its discretion when it grants access to a grandparent who has not met this standard . . . ." *In re Derzapf*, 219 S.W.3d 327, 333 (Tex. 2007) (orig. proceeding).

In *H.L.*, we held that grandparents did not have standing under section 153.432 to seek possession of and access to their grandchild because the facts alleged in their supporting affidavit were insufficient as a matter of law to show that denial of possession of or access to the child would have significantly impaired the child's physical health or emotional well-being. *H.L.*, 613 S.W.3d at 727. The grandmother averred in her affidavit that she had a close relationship with the child and that the

child had expressed frustration and sadness at having lost contact with her grandparents. *Id.* at 726. The grandmother was concerned that the child would be significantly impaired by her loss of contact with the grandparents because such would teach the child that "people can be abandoned" and lead the child to believe that her grandparents did not love her. *Id.*

We noted that, at best, the grandparents' allegations reflected "frustration, anger, or perhaps a 'lingering sadness'" on the part of the child, but were devoid of

> any facts pertaining either directly or indirectly to [the child's] current physical or emotional well-being or to show that [the child] had suffered any significant impairment yet. Instead, [the grandmother] made a conclusory assertion about the results of denial of possession or access and made unsupported predictions about what the lack of possession or access would teach the child in the future.

*Id.* at 727 (citations omitted); *see In re Scheller*, 325 S.W.3d 640, 643–44 (Tex. 2010) (per curiam) (orig. proceeding) (holding that a child's display of anger or isolated instances of bedwetting and nightmares coupled with lay-witness testimony from people who had observed the grandparent with the child that denying access would impair the child were insufficient to show significant impairment); *see Derzapf*, 219 S.W.3d at 330 (holding no significant impairment where, even after a psychologist testified that it would "not be healthy" to cut off grandparents' contact from the grandchildren, there was no evidence showing that the children experienced depression, behavior problems, or anything more than "lingering sadness" from being separated from their grandparents); *In re Turan*, No. 13-19-00124-CV, 2019 WL 4871484, at *5 (Tex.

18

App.—Corpus Christi–Edinburg Oct. 2, 2019, orig. proceeding) (mem. op. on reh'g) (holding that grandparent did not meet the significant-impairment standard where she testified that the child had shown a change in emotional well-being since contact had been reduced and that the child had expressed a desire for more contact with grandmother); *In re J.M.G.*, 553 S.W.3d 137, 143 (Tex. App.—El Paso 2018, orig. proceeding) (holding no standing for grandmother who did not allege "any facts pertaining either directly or indirectly to the grandchildren's physical or emotional well-being").

**Analysis**

Thus, we must determine if Grandmother's affidavit and the evidence adduced at the temporary-orders hearing were sufficient as a matter of law to show that denial of Grandmother's possession of or access to B.T. would significantly impair B.T.'s physical health or emotional well-being. *See* Tex. Fam. Code Ann. § 153.432. We conclude that any relevant allegations by Grandmother were either insufficient to show significant impairment or were sufficiently negated by the evidence asserted at the temporary orders hearing. *See Miranda*, 133 S.W.3d at 227.

To show significant impairment, Grandmother averred in her affidavit that she had been a consistent financial and psychological caretaker for B.T. and had a "close emotional bond" with the child. She alleged that Mother was placing B.T. in unsafe conditions and cited seven particular instances to illustrate these conditions. At the hearing, she reiterated the substantial amount of care she had given to B.T. and added

that B.T. had even referred to her as "mom" at one point. According to Grandmother, Mother was incapable of caring for B.T. without Grandmother's help, often left B.T. in the care of various friends, and struggled to control B.T. Grandmother worried that B.T. would lose a stable influence if their access to one another was curtailed. Further, at a recent visit with Grandmother, B.T. had expressed a desire not to return to Mother and instead remain with Grandmother.

In her testimony, Mother confirmed that Grandmother had cared extensively for B.T. over the course of the child's young life but also explained that, in her opinion, the relationship between Mother and Grandmother had made it such that continuing to utilize Grandmother as a daily caretaker for B.T. was not in the child's best interest. Mother provided additional context for each of the seven instances raised by Grandmother and both Mother and maternal grandmother stated that B.T.'s behavior had not been different in recent months: no growth regression, bedwetting, or despondency. Further, Mother had not severed all contact between B.T. and Grandmother.

It was well established that Grandmother and B.T. had a bonded relationship. But Grandmother provided no facts—neither in her affidavit nor at the hearing—that B.T. had been significantly impaired by Grandmother's having less access to and possession of her. As in *H.L.*, Grandmother made only conclusory assertions and predictions about what the lack of possession and access might mean for B.T. *See H.L.*, 613 S.W.3d at 727. Further, she did not rebut the testimony that B.T.'s behavior

20

had not changed in recent months and even confirmed that B.T. was "her normal self" at a recent visit. *See Derzapf* 219 S.W.3d at 330. The fact that B.T. was sad at the prospect of leaving Grandmother's care is not sufficient to establish standing under section 153.432 of the family code.

Similarly, the trial court conferred upon this case the broad supposition that a child "may" be traumatically or significantly harmed when contact between the child and an attachment figure ceases—even though the pleadings and evidence before it were devoid of any showing that B.T. herself was suffering any such trauma or harm or that the contact between B.T. and Grandmother was going to cease altogether. *See Troxel*, 530 U.S. at 68–75, 120 S. Ct. 2061–65 (holding that a trial court's order for grandparent access unconstitutionally infringed on the parent's fundamental rights where there was no evidence that the parent was unfit, that the child's health and well-being would suffer, or that the parent intended to exclude grandparent access entirely).

As to the seven incidents raised by Grandmother in her affidavit, Mother explained these sufficiently to lead the trial court to characterize them as mere "accidents." Further, most of the incidents occurred before the Grandmother was supplanted as B.T.'s daily caregiver. In other words, they cannot reasonably serve as facts showing that the child is suffering or will suffer significant impairment if Grandmother's possession of and access to B.T. is curtailed.

Having appropriately considered the pleadings and evidence, we hold that Grandmother did not, as a matter of law, establish standing under section 153.432 to assert her claim for possession of and access to B.T. Because we have already held that Grandmother does not have standing under 102.003(a)(9), we hold that the trial court abused its discretion by not dismissing Grandmother's possession and access claim and by entering its temporary orders naming Grandmother a temporary possessory conservator and granting her access to B.T.

## No Waiver of Mandamus Relief

Grandmother contends that Mother waived any right to mandamus relief because she did not exercise due diligence by waiting to file her petition until December 13, 2021—approximately five months after the trial court rendered its oral order and three months after signing its written order. We overrule Grandmother's argument because she failed to show harm stemming from Mother's delay.

Although mandamus is not an equitable remedy, its issuance is largely controlled by equitable principles. *In re Users Sys. Servs., Inc.*, 22 S.W.3d 331, 337 (Tex. 1999, orig. proceeding). One such principle is that "[e]quity aids the diligent and not those who slumber on their rights." *Rivercenter Assocs. v. Rivera*, 858 S.W.2d 366, 367 (Tex. 1993) (quoting *Callahan v. Giles*, 155 S.W.2d 793, 795 (1941)). Thus, it is well established that mandamus relief may be denied where a party inexplicably delays asserting its rights. *In re Hinterlong*, 109 S.W.3d 611, 620 (Tex. App.—Fort Worth 2003, orig. proceeding). In determining whether a relator's delay bars mandamus

22

relief, a court may analogize to the doctrine of laches. *Id.* A party asserting the defense of laches must show both an unreasonable delay by the other party and harm resulting to it because of the delay. *Id.*

Here, Grandmother provides no showing that she was harmed by Mother's delay in filing her mandamus petition. Accordingly, we overrule Grandmother's argument that Mother waived mandamus relief by failing to exercise due diligence.[6]

## Conclusion

Because Grandmother's lack of standing left the trial court without subject-matter jurisdiction over her claims for conservatorship and for possession and access, the trial court abused its discretion by (1) failing to dismiss those claims, (2) granting Grandmother temporary access and possession, and (3) naming her B.T.'s temporary possessory conservator. Therefore, we sustain Mother's standing issues and conditionally grant Mother's petition for writ of mandamus. We order the trial court to vacate its temporary orders naming Grandmother possessory conservator and granting her possession of and access to B.T. and to dismiss Grandmother's claims for lack of standing. Only if the trial court fails to comply with this court's order will we issue the writ. We further deny Mother's motion for emergency relief as moot.

---

[6]This opinion is based on the record before us. We express no opinion as to whether Grandmother may seek relief in the future based on a different motion and record.

23

/s/ Mike Wallach

Mike Wallach

Justice

Delivered:  February 3, 2022